**James A. CARD, Plaintiff,**

v.

**Richard L. DUGGER, etc.; et al., Defendants.**

**No. 86–572–Civ–J–14.**

United States District Court, M.D. Florida, Jacksonville Division.

June 17, 1988.

---

Peter P. Sleasman, Florida Institutional Legal Services, Inc., Gainesville, Fla., for plaintiff.

Kimberly J. Tucker, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for defendants.

## OPINION

SUSAN H. BLACK, District Judge.

### History

Plaintiff, a Roman Catholic, is an inmate of the Florida penal system under a sentence of death and confined on Death Row at Florida State Prison. Plaintiff initiated this action by filing a civil rights complaint pursuant to 42 U.S.C. § 1983 on October 17, 1986. Defendant Dugger was the Superintendent of Florida State Prison during the period from May 7, 1986 to June 5, 1986. He is currently the Secretary of the Florida Department of Corrections. Defendant Barton is presently Superintendent of Florida State Prison. The Governor of the State of Florida has signed warrants directing the execution of Plaintiff on two occasions, May and June, 1986, and August and September, 1987.

On May 7, 1986, the Governor signed a warrant directing the execution of Plaintiff's death sentence between May 29, 1986 and June 5, 1986. Plaintiff was immediately placed on active death warrant status, known as "Death Watch." In 1986, while on Death Watch, Plaintiff had to speak to his citizen volunteer priest via an electronic speaker system in the Maximum Security Visiting Park and Plaintiff was prevented from receiving Holy Communion until the eve of his execution date. At that time, there was also close supervision by a correctional officer in the Visiting Park. Plaintiff received a stay of execution on June 3, 1986.

In February of 1987, Department of Corrections' officials met with representatives of the Roman Catholic Church, including Bishop John J. Snyder, in an effort to accommodate the Roman Catholic requirements for the Sacrament of Reconciliation (Confession) and for the Sacrament of Holy Communion. As a result of this meeting,

changes were made to the facilities and the security procedures in the Maximum Security Visiting Park. On March 16, 1987, a Florida State Prison internal memorandum summarized the changes. *See* Defendants' Exhibits D and E. The Visiting Park was renovated by removal of microphones and replacement with direct voice baffles to allow for privacy and to eliminate electronic interference. Inmates are allowed to meet with their priests for Confession, Mass, and counseling at the north end of the Park, approximately forty feet from the south end of the Park, where a correctional officer is stationed. Inmates may receive Communion at the end of each visit at the grille gate through the gate bars.

Plaintiff's second warrant was issued by the Governor on August 18, 1987, and Plaintiff was placed on Death Watch status again. Ultimately, Plaintiff received another stay of execution and Plaintiff filed an Amended Complaint on November 12, 1987. On January 13, 1988, Defendants filed a Motion for Summary Judgment. Plaintiff filed a response on March 4, 1988, stating that he is not personally comfortable with the changes made in the visiting procedures and the visiting facilities for death row inmates. This cause is now before the Court on Defendants' Motion for Summary Judgment concerning Plaintiff's Amended Complaint.

## Background

Plaintiff names Richard L. Dugger, individually and in his official capacity as Secretary of the Florida Department of Corrections and Thomas Barton, in his official capacity as the Superintendent of Florida State Prison, Starke, Florida, as the only Defendants in this action. Plaintiff's amended complaint contains three claims: (1) Plaintiff has been denied the free exercise of his religion as guaranteed by the First Amendment of the Constitution of the United States by the implementation and enforcement of Florida State Prison Institutional Operating Procedures which prohibit the Plaintiff, while he is on Death Watch, from having contact visits [1] with his citizen volunteer priest and restricts the number of visits Plaintiff may receive from his citizen volunteer priest; (2) Florida State Prison Institutional Operating Procedure 34 (hereinafter referred to as IOP 34) which allows Florida State Prison employed chaplains (all of whom are Protestants) to have contact visits with Death Watch Inmates, while prohibiting a non-employee Catholic priest from having contact visits with Death Watch Inmates, deprives the Plaintiff of the equal protection of the laws guaranteed by the Fourteenth Amendment. Plaintiff asserts that he is forced to share a limited amount of visiting time between his priest and his family during social visiting hours whereas Protestant inmates have continual access to the Protestant, Florida State Prison employed chaplains; and, (3) The Florida Department of Corrections has violated the Establishment Clause of the First Amendment by refusing to hire non-Protestant ministers as chaplains in the state prison system.

Plaintiff states that Plaintiff's damage claim against Defendant Dugger only relates to Defendant Dugger's refusal to permit contact visits between Plaintiff and his priest during the Plaintiff's first stay on Death Watch in 1986. *See* Plaintiff's Response to Defendants' Motion for Summary Judgment.

During the oral argument on summary judgment, the parties agreed to the essential facts in this cause. The facts disputed are not material.[2] Because there are no

---

**1.** Contact visits are visits where the inmates are allowed to have physical contact with the visitors.

**2.** The parties, in their Pretrial Stipulation, filed March 21, 1988, listed five facts in dispute. The Court finds that these items in dispute do not prevent summary judgment in this action.

    A. Whether Mr. Card's claimed need for daily Communion, while on Death Watch, is idiosyncratic.

The Court will assume, for summary judgment purposes, that Plaintiff is sincere in his asserted religious beliefs.

    B. Whether changes which have been made to the Florida State Prison No–Contact Visiting Park sufficiently accommodate the Plaintiff's religious needs.

The reasonableness of the changes in the No–Contact Visiting Park is a question of law (i.e., is

genuine issues of material fact, this Court is of the opinion that Defendants' Motion for Summary Judgment should be granted and judgment should be entered in favor of the Defendants.

### Facts Not in Dispute

On May 7, 1986, the Governor of the State of Florida issued the first warrant directing the execution of Plaintiff's sentence. The warrant directed that the sentence be executed some day between May 29, 1986, and June 5, 1986. Plaintiff was immediately placed on active death warrant status, known as "Death Watch," and scheduled for execution at 7:00 A.M., June 4, 1986. Death Watch has two phases: Phase I begins the date that the warrant is signed and continues until the beginning of the week in which the execution is actually carried out. Phase II begins on the first day of the week in which the execution is to be carried out and lasts either until the prisoner is executed, receives a stay, or the warrant expires.

While Plaintiff was on "Death Watch" in 1986, Plaintiff was prohibited from having physical contact with visitors until several hours prior to the execution of his sentence. Inmates in the Maximum Security Visiting Park were separated from their visitors by a glass barrier which prohibited any physical contact. Inmates and their visitors were required to communicate through an electronic speaker system. However, the Plaintiff was permitted contact visits with his attorneys during Phase I.

As noted previously, since the Plaintiffs' first stay on Death Watch, changes have been made in the Death Watch visiting procedures which now permit limited contact with clergy at the east grille gate of Florida State Prison for purposes of administration of the Holy Sacraments during normal "social" visiting hours, at the conclusion of a clergy visit. Also, the electronic speaker system in the Maximum Security Visiting Park has now been replaced with a noise baffling system, consisting of a circular wire mesh screen covered by a metal speaker plate.

Plaintiff received a Court ordered stay of his execution on June 3, 1986. Plaintiff was released from his first Death Watch status; therefore, Plaintiff never came within a close enough proximity to the time for the execution of his sentence to be permitted a final contact visit with his Catholic priest.

The regulations governing visitation for inmates placed on Death Watch are set forth in Florida State Prison IOP 34, entitled Staff Responsibilities and Special Pro-

the regulation reasonably related to legitimate penological interests), not a question of fact.

C. Whether Death Watch inmates receive the opportunity for a contact visit with an outside religious representative prior to scheduled execution, separate from the contact visit with his social visitors.

During the oral argument on summary judgement, both parties stated that they are in agreement that the condemned inmate is allowed a final non-contact visit with attorneys, religious representatives, and family from 8:00 P.M. to midnight of the evening preceeding scheduled execution. From midnight until 1:00 A.M., the condemned inmate is allowed a contact visit with his family (the attorneys and religious representatives are allowed to attend also), and from 1:00 A.M. to 4:00 A.M., the condemned inmate has the option, on the approval of the Assistant Superintendent, to have a cell-front contact visit (through the cell bars) with an institutional chaplain or approved religious representative.

D. Whether Mr. Card, as a Roman Catholic, has the same visiting privileges with his chosen religious representative as is granted to inmates of Protestant faiths, specially Southern Baptist.

The Court finds that there is no factual question that between May 7, 1986, and June 5, 1986, and currently, that all chaplains at Florida State Prison were, and are, members of the Southern Baptist faith. There is also no question that because these chaplains are employed by the Florida Department of Corrections, they have greater and easier access to condemned inmates. It is also clear that all prisoners have the same access to outside religious representatives and the same access to institutional chaplains. Accordingly, the Court finds that this question will not prevent the Court from deciding the case on summary judgment.

E. Whether the Florida Department of Corrections purposely discriminated against Catholics in the hiring of Florida prison chaplains, at least through the year 1985.

This question is outside the scope of the litigation. Again, this is not a disputed issue of material fact.

cedures for Inmates with Death Warrants[3]. This procedure allows priests or ministers to visit a condemned inmate "at the same time and under the same circumstances as social visitors." *See* Plaintiff's Exhibit 1, IOP 34. During Phase I, religious and social visitors are allowed visits with the condemned inmate two days per week, Monday through Friday, 9:00 A.M. to 3:00 P.M., in the Maximum Security Visiting Park at Florida State Prison. During Death Watch Phase II, the active week of an inmate's Death Warrant, the condemned inmate is allowed two hours, daily, of religious and social visits in the Maximum Security Visiting Park. Additionally, IOP 34 provides for a special cell-front visit between the priest and a condemned inmate immediately prior to execution, if authorized by the Florida State Prison Superintendent.

All of the state employed chaplains at Florida State Prison are of the Southern Baptist religion. They were all of the Southern Baptist faith between May 7, 1986, and June 5, 1986. Institutional Chaplains are allowed to have contact visits with inmates on Death Watch, during Phase I and Phase II. They were, and currently are, permitted to visit Death Watch inmates at their cells every day of the week for as long as they wish. There are no Catholic Chaplains available to inmates at Florida State Prison; consequently, Catholic inmates must rely upon "citizen volunteer" Catholic priests for their religious needs. It should be noted that all other Florida State Prison inmates of religious faiths other than Baptist must rely on "citizen volunteer" representatives for their particular or special religious needs. Father Joseph Maniangat is a "citizen volunteer" Catholic priest who is well known to prison officials at Florida State Prison and has been permitted to enter the prison to minister to Roman Catholic inmates on Death Row and in the confinement areas for approximately the past four years.

IOP 34 provides that Plaintiff's attorney of record or another licensed attorney ap-

proved by the attorney of record, the inmate, his family or a paralegal aid in a previously established employer-employee relationship with an attorney representing the inmate may visit with the condemned inmate on Death Watch. During Phase I, these visits are contact-type visits held in the Florida State Prison visiting rooms located in the Colonel's office area.

Currently, there are three interview rooms available for Death Watch contact visits. All three rooms have windows which permit visual supervision by correctional officers and all three rooms may be used for contact legal visits. Contact media visits are limited to the largest of the three rooms. This room has large windows which permit greater supervision. Between May and June of 1986, there were only two rooms available for Death Watch visits. *See* the Joint Factual Stipulation filed May 18, 1988.

During Phase II, legal visits are normally non-contact visits and are held in the Maximum Security Visiting Park. *See* IOP 34. During both phases, legal visits may be scheduled Monday through Friday between 8:00 A.M. and 4:30 P.M. Otherwise, the number and duration of legal visits are not limited. IOP 34 permits the Superintendent or his designee to authorize a legal visit to occur on any day, at any time.

### Free Exercise of Religion

■ Plaintiff claims that he has been denied the free exercise of his religion as guaranteed by the First Amendment by the implementation and enforcement of Florida State Prison Institutional Operating Procedure 34 which prohibits Plaintiff, while he is on Death Watch, from having contact visits with his citizen volunteer priest and restricts the number of visits Plaintiff may receive from his citizen volunteer priest. It is clear that prisoners retain the protections afforded by the First Amendment, including the right to exercise their religious beliefs. However, their constitution-

---

**3.** An Institutional Operating Procedure is an official explanation of the established way of

carrying on the business of an institution.

al rights are subject to restrictions and limitations, and the Court must allow wide-ranging deference to prison administrators in the adoption of policies judged necessary to preserve internal order, discipline and security. *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

First, this Court must note that the challenged Institutional Operating Procedure has been modified in an attempt to accommodate Plaintiff's and other inmates' religious needs. *See* Defendants' Exhibits D and E. The following changes have been implemented:

1. The no-contact visiting park has been renovated by removal of microphones and replaced with direct voice baffles, thus eliminating "electronic interference."

2. To facilitate the privacy of Confession, the inmate and the priest will be placed in the respective booths at the north end of the no-contact park. The officer will remain just inside the door, at the south end of the no-contact part (a distance of approximately forty (40) feet).

3. The arrangement as described in # 2, above, is acceptable for Confession and Mass, except for the administering of Holy Communion.

4. Holy Communion will be administered at the conclusion of the visit. The inmate and priest will exit from the no-contact visiting park into the East Corridor (on opposite sides of the bar grille). The priest will administer the Sacrament of Communion through the bars with the officer's direct supervision. This will conclude the visit and the inmate will be returned to his cell.

Defendants' Exhibit E, memorandum dated March 16, 1987, entitled Religious Sacraments/Death Watch.

Accordingly, this Court will review Plaintiff's claims for injunctive and declaratory relief in light of the accommodations that have been made by the Department of Corrections concerning special procedures for inmates with death warrants, including the Religious Sacraments/Death Watch procedures.

In order to evaluate whether Plaintiff's claim that the prison policy, as modified, infringes upon Plaintiff's constitutionally-protected right to the free exercise of religion, the Court will make two primary inquiries: (1) Is the Plaintiff sincere in his asserted religious beliefs; and (2) If the Plaintiff is sincere, and the regulation impinges on Plaintiff's free exercise of his religion, is the regulation reasonably related to legitimate penological interests. *Martinelli v. Dugger,* 817 F.2d 1499, 1503 (11th Cir.1987); *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987).

As noted earlier, for the purpose of entertaining Defendants' Motion for Summary Judgment, the Court will assume that Plaintiff is sincere in his asserted religious beliefs. The parties are in agreement that, to determine whether the modified visiting policy for priests, ministers, and other religious representatives currently used by the Department of Corrections is sufficient under *Turner* and *O'Lone,* the Court must consider the following factors:

(1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, (2) whether there are alternative means of exercising the right that remains open to prison inmates, (3) the impact accommodation of the asserted constitutional right will have on guards, other inmates, and on the allocation of prison resources, and (4) the presence or absence of ready alternatives that fully accommodate the prisoner's rights at *de minimus* costs to valid penological interests.

*Turner v. Safley,* 107 S.Ct. at 2262.

Plaintiff asserts that the current modified policy does not provide for the confidentiality and privacy needed for Confession, that he still cannot take *daily* Communion during Death Watch Phase I, that receiving Communion at the grille gate is inadequate because people are passing by

and are looking at Plaintiff, and that Plaintiff must surrender time for family visits to see his priest. Plaintiff must still divide his social visiting time between his family and his priest or see them jointly. During Phase I, Plaintiff is only permitted religious visitors twice per week and Plaintiff wants daily Communion. Plaintiff complains that the voice baffling system is difficult to use because Plaintiff must raise his voice.

*First Factor*

This Court finds that there is clearly a valid, rational connection between the Institutional Operating Procedure 34, as modified, and the penoligical objective of maintaining security. Florida State Prison is a maximum security institution. As of September 15, 1987, the inmate population included 272 inmates under the sentence of death housed in Administrative Confinement status known as Death Row. These inmates have little reason to fear ordinary disciplinary action because of their situation. They are desperate and unpredictable persons. *See* Defendants' Exhibit E, the Affidavit of Dennis T. O'Neill, p. 28, L. 9–14. As Plaintiff noted in his amended complaint, Death Watch is a special confinement status requiring extensive security supervision of inmates under active death warrant. Affiant Dennis T. O'Neill, the Assistant Superintendent for Operations, Florida State Prison, describes the security needs for Death Row Inmates, and more particularly, for inmates on Death Watch as follows:

> Based on the nature of inmates assigned to death row, this is considered the most critically sensitive confinement housing unit in the Florida prison system with regard to security supervision.... Death row inmates then, as a classification category, pose a most serious threat to society by virtue of the heinous and premeditated nature of their crimes, and correspondingly present a most serious threat to the security of the institution based on their desperate situation with regard to their sentences.... All of the security concerns increase dramatically when an inmate is placed on "death

watch," with an active death warrant and scheduled execution.

Defendants' Exhibit E, the Affidavit of Dennis T. O'Neill.

The average length of time an inmate is on Death Watch is approximately twenty-four (24) days. *See* Defendants' Exhibit K, question 16. Death Watch may last as long as ninety (90) days. *See* the Deposition of Dennis T. O'Neill, p. 14 L. 21 through p. 15 L. 6. Inmates on death watch are housed on the first floor of Q Wing and are separated from other inmates. Deposition of O'Neill, pp. 25–26.

Dennis T. O'Neill, as Assistant Superintendent for Operations at Florida State Prison, is responsible for the security of the institution, including death watch. He concludes that, from a security perspective, death watch inmates should be separated from other inmates and they should be physically separated from social visitors (which includes visiting priests) during death watch for numerous reasons. Among those reasons are, "an inmate under an active death warrant is probably at the most desperate stage of his life, with regard to the escape propensity, if, in fact, anything—you know, if that were a viable option for him, with regard to self-destruction, suicide, with regard to his having virtually nothing to lose, possibly assaulting staff, other inmates solely for the purpose of prolonging his life through additional criminal litigation or whatever the case may be." Deposition of O'Neill pp. 26–27.

The use of the Maximum Security Visiting Park for visiting priests and ministers is justified by concerns of institutional order and security. The inmate is separated from the visitor in a no-contact booth. The Department of Corrections' current policy provides inmates with reasonable access to their priests, ministers or rabbis while insuring the security of the institution. Moreover, Plaintiff is allowed to receive Communion at the grille gate after each visit. The fact that Plaintiff has to do so in front of a correctional officer and other people passing by is merely an inconvenience. Plaintiff has stated that he is not ashamed of taking Communion in public.

*See* the Deposition of Card, p. 79, L. 15–18. Normally, in a non-prison setting, Communion is not given in a private ceremony. *See* the Deposition of Bishop John J. Snyder p. 28, L. 19–24.

Plaintiff complains about the sound quality in the visiting park. The Department of Corrections has replaced the microphones in the glass booths with a voice baffle screen. Moreover, the correctional officer in the visiting park has been moved to a post at the far end of the Park to simply observe Plaintiff. Plaintiff claims that this system is inadequate for private conversations because it requires the inmate to stand up and to put his mouth directly on the voice baffle, and for the priest to put his ear up to the other side. *See* Deposition of Plaintiff, p. 26, L. 11–25. Plaintiff may be uncomfortable with this arrangement, but it provides for both Plaintiff's privacy needs and for the Department of Corrections' security needs. The screen on the voice baffle prevents the introduction of contraband in to the inmate, but it also allows for direct voice access without electronic interference.

The policy adopted by the Department of Corrections accommodating Plaintiff's and other inmates' needs for privacy and contact during visits by priests and ministers clearly meets the standard required by the first factor listed in *Turner*.

Plaintiff also complains that he cannot receive *daily* Communion during Phase I of Death Watch. Again, the limitation on the number of visits by visiting priests and ministers during this intensified security period is justified by legitimate security concerns. Each inmate under death watch is escorted by one officer, usually a high ranking officer, to the visiting park. An officer stays with the inmate throughout the entire visit stationed at the far end of the visiting park. *See* O'Neill's Deposition pp. 23–24. The Department of Corrections is concerned with moving an inmate frequently while the inmate is on death watch: "You know, the other thing you have to take into consideration, we're not just working with social, religious. We've got frequent in and out visits with regard to

attorneys and litigation, you know, in terms of the appellate stages and everything here, and we're working around all of this and running the rest of the institution. We don't close anything in the institution down for death watch. It's just that much more of an additional security supervision problem that comes into play there." Deposition of O'Neill, p. 53, L. 16–25.

Again, the Court finds the policy adopted by the Department of Corrections for two days of visitation per week (for up to six hours per visit) during Phase I of Death Watch is reasonable. During phase II, Plaintiff has the opportunity to receive daily Communion so there is clearly no problem with the regulations for Phase II.

*Second Factor*

Under the second factor in *Turner*, the Court must consider whether there are alternative means for Plaintiff to maintain his religious practices. In *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987), the Court applied the *Turner* factors to uphold a prison work regulation that prevented Islamic inmates from attending Friday Jumu'ah (prayer services). Even though there were no alternative means of attending Jumu'ah for the Muslim prisoners (under their religious beliefs it must occur at a particular time), the Court was "unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end." *O'Lone*, 107 S.Ct. at 2406. Instead, the Court looked to see whether the inmates retained the ability to participate in other Muslim religious observances. Unlike the Muslim inmates in *O'Lone*, Plaintiff has been given alternative means to receive Communion and to have private Confession. Plaintiff is not allowed to have a visiting priest every day during Phase I of Death Watch, but Plaintiff is allowed to have a priest visit twice a week for six hours per visit and Plaintiff can receive Communion. During Phase II, Plaintiff may receive a daily visit from his priest and Plaintiff may receive daily Communion. *See* Plaintiff's Exhibit 1, Institutional Operating Procedure 34 and Defendants' Exhibit D. It

should be noted that Plaintiff is allowed a full contact visit with his priest on the eve of his execution date and Plaintiff is permitted to have a three to four hour cell-front visit with his priest the morning of the scheduled execution, allowing for limited contact due to the cell bars.

Although Plaintiff's practice of Roman Catholicism is limited in certain respects, the record reflects that Plaintiff is able to participate quite frequently in religious observances of his faith. The restrictions placed on these visits are reasonable under the circumstances. *Kahey v. Jones,* 836 F.2d 948 (5th Cir.1988). These restrictions are imposed only during Death Watch and only for a limited period of time. The fact that the Department of Corrections has not satisfied Plaintiff's demand for *daily* Communion during Phase I of Death Watch does not convince this Court that Plaintiff has been denied all means of expression of his religion. The Court will not require prison officials to "sacrifice legitimate penological objectives" in order to satisfy Plaintiff's demands. *O'Lone v. Estate of Shabazz,* 107 S.Ct. at 2406. It is clear that,

> This approach ensures the ability of corrections officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration," ibid., and avoids unnecessary intrusion of the judiciary into problems particularly ill-suited to "resolution by decree."

*Id.* at 2404–05 (citations omitted).

*Third Factor*

The Court must also consider the impact of the requested accommodation. As noted earlier, Plaintiff requests that Defendants provide him with daily visits with his priest, full contact visits with his priest, a Department of Corrections' employed Roman Catholic chaplain, pastoral visits above and beyond the time set for social visits, and visits at his cell from his priest. First, it is clear that if Plaintiff is afforded these privileges, the prison can expect to encounter these requests from inmates of various

faiths. As in *Kahey v. Jones,* 836 F.2d 948, 951 (5th Cir.1988), "[t]he expense and diversion of resources from other penological goals could be considerable. Moreover, if other prisoners are not similarly accommodated, they might well perceive Kahey as being favored."

If the Defendants are required to provide all Death Watch inmates with daily visits to the visiting park during Death Watch Phase I, it would obviously require the staff to be available to escort and observe the inmates while these visits take place. As noted earlier, the institution does not close down during death watch and security considerations for each priest or minister coming into the institution have to be handled and movement procedures have to be coordinated. *See* the Deposition of Dennis T. O'Neill.

Full contact visits to an inmate's cell present even more problems. In this particular case, the citizen volunteer priest, Father Joseph Maniangat, already has a security clearance to go back into Death Row, but that will not be true in every case.[4] Each religious visitor will have to be thoroughly screened which takes time and planning by the security staff. Moreover, contact visits present more of a security problem than non-contact visits.

Plaintiff suggests that since legal visitors are allowed contact visits during Phase I of Death Watch, it follows that religious visitors should be allowed contact visits during Phase I as well. Plaintiff contends that the security risks are the same for both groups and the impact on the institution would be insignificant. Mr. Dennis T. O'Neill, the Assistant Superintendent for Operations, Florida State Prison, points out that attorneys must answer to the bar, and that is one reason why they are treated differently than religious visitors. *See* the Deposition of Dennis T. O'Neill, p. 67–68. It is clear that the state bar thoroughly screens attorneys before they are admitted to the bar, and the state bar disbars attorneys for various reasons,

---

**4.** The Department of Corrections regulations must apply to all outside religious representatives, not just one priest. Accordingly, institutional procedures must be applied neutrally to all inmates.

including criminal offenses. Therefore, the consequences are great if an attorney violates the law or regulations of the Department of Corrections. The Department of Corrections cannot rely on the fact that a visiting priest or minister has been screened by the state. Religious visitors are not always going to be like Father Maniangat, who is already well known to prison officials and has been ministering to Roman Catholic inmates on Death Row at Florida State Prison for the last four years.

Moreover, the Supreme Court has rejected a "least restrictive means test" in reviewing a regulation which impinges on an inmates' constitutional rights. *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The Court must ask if the regulation is reasonably related to legitimate penological interests. There are limited facilities for attorney/inmate contact visits during Death Watch. There are three interview rooms in the Colonel's office which have windows which permit visual supervision. During Death Watch Phase I, these rooms are made available to attorneys challenging death cases. Contact media visits are limited to the largest of the three rooms which has large windows.

Media visits are usually conducted in a group interview, without a physical barrier between the media representatives and the inmate, but the security staff is positioned between the inmate and media representatives. Occasionally, individual visits between a member of the media and a Death Watch inmate have been approved. These visits take place in the "attorney visiting room," but the inmate is restrained by security devices and the meeting is conducted under the direct supervision of at least one security officer. Additionally, media visits are contingent upon the availability of staff to supervise them, agreement of the inmate, availability of the attorney visiting room (use for attorney visits takes precedence over media visit requests), and verifiability of the identity, purpose, and credentials of the media representative. *See* Defendant Dugger's Affidavit filed May 19, 1988. Individual media visits are the exception, not the rule. Also, they are not given preferred status in terms of the amount of time allotted for such visitation.

Since media visits are limited in number, the impact of contact media visits is not as great as it would be for religious and/or social visits. Also, media representatives are usually disinterested visitors who are not emotionally involved on a personal basis with the condemned inmate. Again, it should be noted that staff members are placed between the media representatives and the inmate. This procedure would not satisfy Plaintiff's request for privacy.

To require the Department of Corrections to add religious visitation to the three rooms made available for attorney (and media) contact visits would have adverse effects on the institution. Religious visitors are given a large amount of time to visit inmates and there are only a limited number of rooms available for attorneys to meet with condemned inmates to work on death cases. Also, prison security would be threatened by the large number of religious visitors that would have to be screened prior to and observed during contact visits. In order to provide access to outside religious representatives to all inmates of all faiths, under the same conditions, the use of the Maximum Security Visiting Park is reasonably related to legitimate penological interests.

Plaintiff's request that the Court *require* the Department of Corrections to hire a Catholic chaplain or transfer a Catholic chaplain to Florida State Prison also presents serious problems. The Supreme Court of the United States addressed this question in the context of religious access in prison:

> We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious free-

dom guaranteed by the First and Fourteenth Amendments without fear of penalty.

*Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972).

In a recent opinion, the United States Court of Appeals for the Fifth Circuit discussed the problem of providing some religious groups with special programs while denying other groups special programs:

> Although we have every desire to encourage the Government to provide religious dietary alternatives, providing alternatives acceptable to practitioners of "majority" religions while failing to provide alternatives acceptable to practitioners of less common, even unique, religions poses serious Equal Protection/First Amendment Establishment concerns. *See Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972).

*Udey v. Kastner*, 805 F.2d 1218 n. 2 (1986).

The same type of problem is presented in the case at bar. If the Court requires the Department of Corrections to hire a Roman Catholic chaplain or to transfer a Roman Catholic chaplain to Florida State Prison to satisfy Plaintiff's needs, then if other prisoners of various faiths are not similarly accommodated, they will perceive that the Roman Catholics are being favored over other religions. As noted in *O'Lone*, special arrangements for one group creates problems with other groups. *O'Lone v. Estate of Shabazz*, 107 S.Ct. at 2406. This would leave the Department of Corrections with the tremendous burden of hiring a priest, minister, or rabbi for every faith of Death Watch Inmates.

Plaintiff requests pastoral visits above and beyond the time set for social visits. This is not a reasonable alternative. As noted in the Affidavit of Dennis T. O'Neill (Defendants' Exhibit E), the current policy provides equally for inmates who are religious and for those who are not religious. Under the current policy, "[i]nmates who profess to be "atheist," "agnostic," or who otherwise do not profess a religious preference, are therefore treated the same as those who profess a specific religious belief and request visits from religious represent-

atives thereof." This prevents inmates from religious groups from being favored over non-religious groups.

*Fourth Factor*

The final factor for the Court to review is whether there are ready alternatives to satisfy Plaintiff's requirements at *de minimus* cost to valid penological interests. It is true that the cost in this particular instance concerning Plaintiff may be *de minimus*, but in order for all inmates to be treated equally, the costs would not be *de minimus*. The alternatives Plaintiff has suggested will require the prison to set aside valuable resources. In order for every visiting priest, minister and rabbi to be allowed to go back into the cell area, or to have full contact visits with inmates, or to see the inmates daily would require the resources to insure the safety of the visitor, to prevent the introduction of contraband into the institution, to handle the arrangements for escorting the visitors and the inmates, and to coordinate the procedures. Of course, the fact that the visitor would not be protected by the booth or some other screening device, and the fact that contraband could be introduced more easily into the institution are vital concerns of the Department of Corrections.

In a recent Fifth Circuit case concerning special religious dietary requests, the Court found that "the probable proliferation of claims, and the concomitant entanglement with religion that processing multiple claims would require, does constitute a problem that the state has a good reason to avoid." *Udey v. Kastner*, 805 F.2d 1218, 1221 (5th Cir.1986). The current procedures for visitors avoids the entanglement with religion by treating all outside visitors equally, whether they are religious or non-religious guests, and it avoids the proliferation of requests for visits on Q–Wing, a high security area, where the Death Watch inmates are housed.

As noted earlier under the impact factor, the implementation of more frequent visits or hiring or transferring Department of Corrections' priests or ministers for every Death Watch inmate who does not have a chaplain of his faith at Florida State Prison

are certainly not alternatives that would be implemented at a *de minimus* cost to valid penological interests. The regulations in question are reasonably related to legitimate penological objectives; therefore, they do not offend the Free Exercise Clause of the First Amendment of the United States Constitution.

### Equal Protection Claim

■ Plaintiff asserts that the current Department of Corrections' policy allowing Florida State Prison employed chaplains (all of whom are Protestant) to have contact visits with Death Watch inmates on a regular basis, while prohibiting a non-employee Catholic priest from having contact visits with Death Watch inmates, deprives the Plaintiff of the equal protection of the laws. At the heart of this claim, Plaintiff contends that he is forced to share a limited amount of visiting time between his priest and his family; whereas, Protestant inmates have continual access to the Protestant, Florida State Prison employed chaplains. Currently, all three chaplains at Florida State Prison are Baptists. Chaplains are allowed to go back to the cell area on Q–Wing to visit with Death Watch inmates. Deposition of Dennis T. O'Neill, p. 24, L. 14–25, p. 25, L. 1–3; Plaintiff's Exhibit 9, Affidavit of James A. Card. The religious preference of inmates committed to the Florida Department of Corrections is, as of June 30, 1987:

1. *Protestant:* 71.2% (43% of total population is Baptist)
2. *Catholic:* 16.6%
3. *Other:* 12.2%
4. The Main Unit of Florida State Prison houses 3% of the total Catholic inmate population of the Department of Corrections.
5. The number of Catholic inmates, under sentence of death, is 0.7% of the total Catholic inmate population.

*See* Defendants' Exhibit M, the Affidavit of Frank D. Metcalf.

Recently, the United States Court of Appeals for the Ninth Circuit addressed a similar equal protection claim. The Native American plaintiffs contended that the pris-

on policy prohibiting an inmate Pipe Bearer from conducting a Native American Pipe Ceremony violated their right to equal protection. The plaintiffs noted that "Catholic and Protestant DSU inmates can obtain spiritual guidance immediately upon request because the state provides full-time chaplains of those denominations on the prison premises." *Allen v. Toombs*, 827 F.2d 563, 568 (9th Cir.1987). As relief the Native American inmates requested that the access policy of allowing weekly access for an outside Pipe Bearer (when one is available) be modified. The Court concluded, after citing *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081 31 L.Ed.2d 263 (1972) and *Gittlemacker v. Prasse*, 428 F.2d 1, 4 (3d Cir.1970):

> Since the prison administration is not under an affirmative duty to provide each inmate with the spiritual counseling of his choice, *id.*, and since the OSP permits outside religious leaders to enter the DSU to address the religious needs of Native American inmates, we conclude that the OSP policy provides a reasonable opportunity for the plaintiffs to exercise their faith, and does not violate the equal protection clause.

*Allen v. Toombs*, 827 F.2d at 569.

In the case at bar, the Florida Department of Corrections is not under an affirmative duty to provide the Catholic Plaintiff with a Roman Catholic priest. Florida State Prison allows outside religious leaders to visit Plaintiff on a regular basis to address Plaintiff's religious needs. All inmates have equal access to outside religius representatives. Additionally, all inmates have equal access to institutional chaplains. The Court has already addressed Plaintiff's complaint about having to share a limited amount of visiting time between his priest and his family. This procedure avoids the Department of Corrections favoring religious inmates over non-religious inmates by providing for a neutral category of visitation. Reasonable opportunities have been afforded to Plaintiff to exercise his faith and Plaintiff has not been denied equal protection of the laws.

*Establishment Clause Claim*

■ Plaintiff claims that the Florida Department of Corrections has violated the Establishment Clause of the First Amendment by refusing to hire non-Protestant ministers as chaplains in the state prison system. Out of 47 full-time chaplains employed by the Department of Corrections there are only two non-Protestant chaplains. Plaintiff recognizes that the current hiring policy of the Department of Corrections is simply to hire chaplains that are qualified to serve. Deposition of Metcalf, p. 27, L. 20–23.

Plaintiff is not claiming damages against either Defendant based on the Establishment Clause. Plaintiff simply requests prospective injunctive relief and declaratory relief on this issue to relieve past discriminatory practices. Plaintiff concludes that past hiring practices have established the Southern Baptist religion as the dominant and preferred religion at Florida State Prison, since all three chaplains are Southern Baptists.

As noted in *Cruz v. Beto,* a prison does not have to hire a chaplain, priest or minister without regard to the extent of the demand. The majority of inmates in the Florida Department of Corrections are Protestant. *See* Defendants' Exhibit M. The fact that the Department of Corrections employs three chaplains at Florida State Prison, who happen to be of the Baptist faith, does not mean that the prison has set up the Baptist faith as an institutional religion or as a preferred religion. The Department of Corrections' chaplains are instructed to attempt to meet the needs of the inmates, but if they are not capable of doing so, they are instructed to secure a citizen volunteer priest, minister or rabbi for the inmates. They are also instructed to avoid derogatory statements about other religions and to be aware of other faiths. *See* the Deposition of Frank Davis Metcalf, p. 13, L. 19–24, p. 12, L. 12–16.

With respect to the Plaintiff, the Chaplaincy Service has secured Father Joseph Maniangat, a Roman Catholic priest, to attend to Plaintiff's and other Catholics' needs at Florida State Prison. *See* the Deposition of Father Joseph Maniangat. Venoy Jolly, the chaplain supervisor at Florida State Prison, classifies Father Maniangat as more than a simple volunteer at Florida State Prison. The priest visits Florida State Prison on a regular basis and holds Mass on Sunday mornings for the institution. Moreover, he has access (without supervision) to many areas of the prison, including death row. *See* the Deposition of Venoy Jolly, p. 9–12.

The fact that the Protestant chaplains are unable to satisfy Plaintiff's spiritual needs due to their Protestant background and are unable to provide Plaintiff with the Sacraments due to Plaintiff's beliefs does not mean that the Department of Corrections has discriminated against Plaintiff. The Department of Corrections has secured a Catholic priest volunteer to attend to the needs of Plaintiff and other Catholic inmates.

Frank Metcalf, the Chaplaincy Service Administrator for the Department of Corrections since February, 1987, states that selection of chaplains is based on experience and education and not on religious affiliation. *See* Defendants' Exhibit M. It should be noted that since his employment with the Department of Corrections, no Catholic priests have actually submitted an application for employment with the Department of Corrections. *See* Defendants' Exhibit M.

This Court finds that the Department of Corrections has not violated the Establishment Clause of the First Amendment and that Plaintiff is not entitled to prospective injunctive or declaratory relief. Frank Davis Metcalf has stated, in hiring a chaplain, that, "[w]e would be open to anyone from any religious background, as long as they meet the qualifications that we outlined previously, no matter what denomination." *See* the Deposition of Metcalf, p. 28, L. 7–10.

*Damage Claim/Qualified Immunity*

■ Plaintiff's damage claim against Defendant Dugger relates to Defendant Dugger's refusal to permit contact visits for Plaintiff and his priest during the Plain-

tiff's time on Death Watch status in May and June, 1986. Defendant Dugger asserts that he is entitled to qualified immunity against Plaintiff's claim for monetary damages.

The Supreme Court of the United States has stated that determining "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken...." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted). Under this objective standard, government officials are generally shielded from liability for damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

Plaintiff contends that it was clearly established law in 1986 that all inmates be afforded a reasonable opportunity of pursuing their faith and that Defendant Dugger should not be permitted to claim qualified immunity for his actions.

This Court finds that Defendant Dugger's action of not allowing Plaintiff contact visits during Phase I and Phase II of Death Watch during May and June of 1986, did not contravene clearly established legal rights. The Department of Corrections' regulation, at that time, allowed Plaintiff a full contact visit with his priest on the eve of his execution but did not allow *contact* visits during the rest of the time Plaintiff was on Death Watch status.

The Supreme Court recently stated in *Anderson* that,

> our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

107 S.Ct. at 3039 (citations omitted).

The cases of this circuit certainly do not reflect that Plaintiff had a constitutional right to have contact visits with his priest during all phases of Death Watch. In light of preexisting law, the unlawfulness of preventing contact visits with a priest for a limited period of time was certainly not apparent. Accordingly, Defendant Dugger is entitled to qualified immunity with respect to Plaintiff's claim for monetary damages.

Accordingly, Defendants' Motion for Summary Judgment will be granted and judgment will be entered in favor of the Defendants in accordance with this opinion.