**Joseph GRIFFIN, James Hauser, and Donald Orr, protective custody inmates of Clinton Correctional Facility, individually and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**Thomas A. COUGHLIN, III, Commissioner, New York State Department of Correctional Services, Charles Ward, Director of Special Housing and Inmate Discipline Programs, Eugene S. Le-Fevre, Superintendent, Clinton Correctional Facility, and Ramon Rodriguez, Chairman of the New York State Board of Parole, Defendants.**

No. 83–CV–676.

United States District Court,
N.D. New York.

Aug. 24, 1990.

Prisoners' Legal Services of New York, Plattsburgh, N.Y., for plaintiffs; Robert F. Bensing, Steven Latimer, of counsel.

Robert Abrams, Atty. Gen. of State of N.Y., Albany, N.Y., for defendants; Steven H. Schwartz, Associate Atty. Gen., Robert A. Siegfried, Asst. Atty. Gen., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

Plaintiffs in this case are individuals who have been (since December of 1987, when a class was certified), are, or will be housed in the Protective Custody ("PC") unit of Clinton Correctional Facility ("Clinton"). This case was filed in 1983 and is brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331. The plaintiffs seek injunctive relief to remedy allegedly unconstitutional conditions at the Clinton PC.

The plaintiffs' second amended complaint states five causes of action. First, they allege that the conditions of confinement constitute violations of the eighth and fourteenth amendments of the United States Constitution. Specifically, plaintiffs contend that the following conditions exist and that they violate the eighth amendment: prolonged cell confinement and idleness;

severely limited opportunities for recreation, exercise, education and work; seriously inadequate access to legal assistance, including the institutional law library; denial of either communal religious services, or private consultations with religious advisors; the pervasive fear of being harmed, because of defendants' failure to protect PC inmates; inadequate safety and screening procedures.

The second cause of action alleges an equal protection violation. Plaintiffs allege that the inmates at PC units in Green Haven, Great Meadow, Auburn and Attica are generally afforded greater recreational and programming opportunities than inmates in the Clinton PC. The third cause of action alleges that the defendants place an undue burden on the plaintiffs' assertion of their right to be free from harm and accordingly violate plaintiffs' eighth amendment rights. In essence plaintiffs allege that the conditions are so restrictive at Clinton PC that inmates will be discouraged from seeking protective custody.

In their fourth cause of action, plaintiffs allege that the defendants have failed to provide the PC inmates adequate protection from harm. This, too, plaintiffs contend constitutes a violation of their eighth amendment rights. Finally, the fifth cause of action alleges that the defendants violate plaintiffs' rights under the free exercise clause. As a basis for this claim, plaintiffs contend that they are denied access to regular and confidential religious counseling, sacraments, and services.

## I. THE PARTIES' STIPULATIONS.

A non-jury trial on plaintiffs claims was held from September 19, 1988 through September 23, 1988 in Auburn, New York.[1] Prior to trial, the parties presented the court with 14 itemized stipulations of fact.

These are reproduced below. (The footnotes to these stipulations are the court's additional explanations and are not part of the parties' stipulations.)

1. Protective custody at Clinton Correctional Facility is housed in that institution's E Block.

2. E Block is composed of seven companies[2], each containing 21 cells. Companies one through five are on the south side of the block, with one at the bottom and five at the top. Companies six and seven are on the north side of the block, directly across (respectively from four and five company).[3]

3. One and six companies have "flat" galleries, which run from the cell bars to the block walls. All other companies have "open" galleries, running only part of the way [to the block walls] (roughly four feet) from the cell bars.[4]

4. All cell blocks in Clinton contain open galleries on other than the lowest company blocks.

5. There are no meeting rooms or offices in E block. Aside from the company cells and galleries, the only other available space is the area known as the "landing," in front of each tier of cells.

6. PC is currently located on companies one through four of E block.[5] Company four is involuntary PC, and the other three companies are voluntary.

7. Non-keeplocked PC inmates receive 2 hours daily recreation in the E block yard. Until September 5, 1988 they were receiving 1½ hours daily recreation. Voluntary PC and involuntary PC inmates are recreated separately.

8. PC inmates eat their meals in their cells.

9. PC inmates may obtain two legal books a day. This is done by filling out request slips to the facility law library.

---

1. The court heard further testimony in this case on October 25, 1988 in Albany, New York.

2. A company is one side or one half of a full tier.

3. Clinton's E block is built on a hill. The south side of E block is the downhill side and thus can accommodate five companies, while the uphill

or north side accommodates only two companies.

4. The "flat" galleries are, so to speak, the ground floor. The "open" galleries are reminiscent of balconies and as a result do not reach the walls of the cell block.

5. PC is thus housed on the south side of E block.

10. PC inmates do not go to the law library, or meet with inmate law clerks. Photocopying is available, and inmates can make written requests to the law clerks for assistance.

11. PC has no congregate religious services. Inmates can make requests to meet with religious advisors; such meetings usually occur at the inmate's cell.

12. PC inmates are taken to the facility commissary every two weeks. They receive the same commissary privileges as general population inmates.

13. PC inmates are allowed daily visitation and participation in the family reunion program.

14. Employment for PC inmates consists of roughly half a dozen porter positions, one art instructor, one barber, one inmate tutor, and an inmate librarian.

From this point on, the court will address the facts which relate to each particular claim in the discussion which relates to that claim. In general, the court observes—and as the stipulation recited above illustrates—there was little dispute at trial regarding the conditions under which plaintiffs reside in Clinton PC. At the core of many of the disputes in the present action is a debate regarding the manner in which the resources available to the Clinton Correctional Facility should be allocated. Plaintiffs implicitly contend that they suffer to benefit other inmates at Clinton.

## II. CONDITIONS AT CLINTON PC; EQUAL PROTECTION.

A facially appealing argument raised by plaintiffs at trial relates to denial of equal protection under the law. U.S. Const., amend. XIV. Plaintiffs contrasted their situation with those of inmates in other PC units in the state and with inmates in special programs at Clinton itself. Plaintiffs pointed to discrepancies and claimed that the corrections officials have no rational basis for continuing the discrepancies. At trial, the court received the distinct impression that PC inmates feel as though they

are second class citizens. Certainly, plaintiffs' griping is well-founded in fact; the question is whether the disparity of treatment is unjustified, or rises to a level for which the court should order remedial action.

The protective custody unit at Clinton functions to protect inmates who cannot remain in the general prison population.[6] Inmates housed in PC run the gamut from victims to the victimizers. Consequently, it is not surprising that some of the inmates at Clinton PC are placed in protective custody even though they do not request the placement. These inmates reside in, what is referred to as, Involuntary Protective Custody ("IPC"). Inmates are only transferred to IPC following a due process hearing.

As the stipulation recited above indicates, plaintiffs spend much time in their cells. They are accorded two hours of recreational time in the E Block yard, a yard which is only accessible through E Block. Meals are served to plaintiffs in their cells. They have no out-of-cell formal programming. For instance, plaintiffs have an in-cell study program, but not an out-of-cell study program. Plaintiffs may not leave E Block to participate in congregate religious services. PC inmates do not have access to a law library. They may order books from the facility's law library, but may only order two books a day. PC inmates may not order Shepards.

PC inmates are given certain privileges. They may visit the prison commissary twice a month. They can shower two or three times a week; naturally, that is outside the cell block. Furthermore, they may use prison telephones daily and have unlimited contact visits. PC inmates may view a TV in their yard when they are exercising in the yard. The yard also houses what might best be described as a book and game shack. Books are rotated in and out of the shack every two months. Games such as chess and checkers are kept there,

---

6. "Protective custody is a status available to a[n] ... inmate when he fears for his safety or when the warden believes the inmate's safety may be in jeopardy." *Williams v. Lane,* 851 F.2d 867, 871 (7th Cir.1988), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989).

as well as two baseball mitts, a football, a softball, and a basketball.

By way of contrast to the conditions of confinement in Clinton PC, plaintiffs (and defendants) introduced evidence regarding other specialized programs at Clinton. Clinton houses a program, state-wide in scope, known as the Assessment Program Preparedness Unit ("APPU"). APPU in many ways is similar in its goals to PC. In fact, one purpose of the APPU program is to provide an alternative to PC. In essence, APPU takes victim-prone inmates and attempts to prepare them for return to general prison population. APPU inmates may attend congregate religious services. APPU facilities and programs include a vocational handicraft shop, a general drafting shop, therapy sessions, counseling sessions, a small law library, and a number of educational services ranging from basic adult education to high school equivalency. Inmates who are enrolled in APPU may use the mess hall and the gym.

The testimony of William Burke, Supervisor of APPU, revealed that there is a waiting list of inmates who wish to participate in the APPU program. Furthermore, Burke testified that the screening process for each APPU applicant lasts approximately three to four months. By comparison, the length of time for a screening prior to entering Clinton PC ranges from minutes to a day or two. Transcript ("Tr.") 496. Ideally Clinton PC is a place of transience. In accordance with this philosophy, a majority of the inmates in Clinton PC transfer out of that unit in 75 days or less.[7] However, a smaller percentage of inmates remain in Clinton PC for more than six months. *Supra* note 7.

Plaintiffs and, as a result, defendants also compared Clinton PC to the Merle Cooper program at Clinton. The Merle Cooper program is primarily geared towards inmates who have committed sexual offenses. It evolved from a program which targeted repeat offenders and inmates with lengthy prison sentences. The Merle Cooper program is housed in the Clinton Annex which is the old Dannemora State Hospital. Inmates in the Merle Cooper program are granted the following amenities: wood shop; gym; movies; cooking facilities; refrigerators; color television; communication meetings and group therapy.

Additionally, plaintiffs compared living conditions at Clinton PC with the conditions of the inmates in the intermediate care program ("ICP"). ICP is a mental hygiene program with two stated purposes: to ease mental patients back into general population or to house such inmates for a long period of time. ICP inmates are quartered in the same cell block as PC inmates, E Block. ICP inmates reside, however, on the north side of the block which is composed of only two companies, 6 and 7. IPC inmates are afforded gallery recreation on the flat in front of Company 6; furthermore they have a TV on the flat as well. As indicated above, PC inmates are not permitted gallery recreation and their TV is in the E Block yard.

Finally, plaintiffs rest on the following contrast between Clinton PC and the protective custody units in other New York State correctional facilities. At Sing–Sing the PC inmates enjoy 6 hours outside their cells; at Green Haven the amount of out-of-cell time is 5 hours; at Great Meadow PC inmates receive 2½ hours recreation plus two communal meals; at Auburn they receive 3¼ hours of gallery recreation, plus outdoor recreation; at Sullivan the PC inmates receive 10 hours of gallery recreation.

The appropriate analysis for an equal protection claim is whether the unequal treatment bears a reasonable relationship to legitimate penalogical interests.[8]

---

7. In 1987, 63% of the inmates in IPC and voluntary PC remained there for 75 days or less. Exhibit ("Exh.") E. 14% remained for more than 180 days. *Id.* In 1988, 75% of the IPC and voluntary PC inmates remained in Clinton PC for 75 days or less. Exh. D. 2% remained more than 180 days. *Id.*

8. Since prisoners are not a suspect class, a stricter standard of review is not appropriate. *Moss v. Clark,* 886 F.2d 686, 690 (4th Cir.1989).

*Benjamin v. Coughlin*, 905. F.2d 571, 574–75 (2d Cir.1990); *Langone v. Coughlin*, 712 F.Supp. 1061, 1066 (N.D.N.Y.1989) (McCurn, C.J.); *see Williams v. Lane*, 851 F.2d 867, 881 (7th Cir.1988), *cert. denied*, 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989) (determining whether or not inmates' guarantee of equal protection under the law was violated by considering whether the "[u]nequal treatment ... is justified [by] a rational relation to legitimate penal interest[s]"). In evaluating plaintiffs' equal protection claim, this court will apply the four factors set forth in the Supreme Court's decision in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). *See Benjamin*, 905 F.2d at 574–75. First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. The second inquiry is whether there are alternative means of exercising the right that remain open to prison inmates. Third, the court must assess the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. Fourth, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. 482 U.S. at 89–90, 107 S.Ct. at 2261–62. Finally, a recent decision by the Second Circuit has established that plaintiffs bear the burden of showing irrationality in the justifications put forward by defendants for disparate treatment. *See Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir.1989).

■ During trial the defendants articulated fiscal concerns, safety and security concerns, and concerns of institutional order as those concerns which prompted them to limit the number of activities available to inmates in Clinton PC. *See* Tr. 391–95; 575. These are legitimate concerns for defendants to act upon. *Turner*, 482 U.S. at 91, 107 S.Ct. at 2262; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987); *Martinelli v. Dugger*, 817 F.2d 1499, 1506–07 (11th Cir.1987), *cert. denied*, 484 U.S. 1012, 108 S.Ct. 714, 98 L.Ed.2d 664 (1988); *Hendrix v. Evans*, 715 F.Supp. 897, 913 (N.D.Ind.1989); *Langone*, 712 F.Supp. at 1066 n. 6. In specific, the Superintendent of Clinton Correctional Facility, defendant Eugene S. LeFevre, testified that he was concerned with the safety and the security of PC inmates. Tr. 399. Because the plaintiffs are in protective custody, he desired to minimize their exposure to the outside general prison population. Tr. 391. In addition, he was concerned that granting the plaintiffs more privileges would impede the activities of the general prison population. Tr. 393. Finally, LeFevre expressed a financial concern that providing plaintiffs with more activities and greater availability of prison resources would require him to reallocate staff and funds in a manner which would not be cost-effective. Tr. 394, 408.

As they must, plaintiffs contend that defendants' justifications are irrational. They raise several contentions. First, plaintiffs claim that the justifications for minimal outdoor recreation are irrational because the PC inmates received a ½ hour increase in recreation just before trial commenced. They complain that "it took [LeFevre's] administration *six years* to increase recreation time, even though the increase did not necessitate any change in security staffing." Plaintiffs' Post–Trial Memorandum, Doc. 177, at 10 (emphasis in original). In the court's interpretation of events, the increase *may* indicate that the earlier allotment of time for outdoor recreation was irrational. However, plaintiffs only seek injunctive relief with respect to the present situation. The fact that the outdoor recreation time was increased, if anything, lessens the need for injunctive relief at the present.

Plaintiffs also point out that Clinton PC inmates used to enjoy in-door recreation on the "flats." Superintendent LeFevre justified taking away the in-door recreation because, after the formation of APPU, the composition of the inmates in PC changed for the worse. Tr. 398, 418. In-door recreation became more risky. Plaintiffs attack this justification on two grounds. They claim it was rendered in too conclusory a fashion. Plaintiffs' Post–Trial Memoran-

dum, Doc. 177, at 9. However, in claiming that LeFevre's explanation is too conclusory, plaintiffs are inappropriately attempting to transfer to defendants the burden of explaining the rationality of a justification. Furthermore, LeFevre is an individual who has a longstanding knowledge of Clinton. He made and maintained the changes with respect to in-door recreation on account of discussions with his staff. At trial, plaintiffs did not demonstrate that LeFevre was expressing an opinion not based upon his personal knowledge.

Plaintiffs cite as a second ground for disbelieving LeFevre's justification the fact that every other maximum security unit in the state permits in-door recreation. Plaintiffs' contention is unconvincing. As LeFevre testified, Clinton presents a unique situation. It has open galleries enclosed only with screening. Objects such as bits of glass or urine and feces can be thrown through the screening from an upper gallery onto the flat. Tr. 164, 185–86, 302, 422. LeFevre testified that in Attica Correctional Facility the galleries were not open as they are at Clinton. Thus, in-door recreation in Attica could be safer. Tr. 418–20. Moreover, the Supreme Court has cautioned that "the Constitution 'does not mandate a "lowest common denominator" security standard, whereby a practice permitted at one penal institution must be permitted by all.' " *Turner*, 482 at 95 n. *, 107 S.Ct. at 2265 n. * (citation omitted); *Fromer*, 874 F.2d at 74–75; *see also Moss v. Clark*, 886 F.2d 686, 691 (4th Cir.1989). In this instance, the court declines to impose a lowest common denominator to be imposed on maximum security protective custody units.

Plaintiffs next argue that LeFevre has a 45 million dollar budget at his disposal each year and that from this budget he should be able to increase the PC staffing and add activities for PC inmates. They point to the fact that Clinton maintains a resource pool of 50 corrections officers and that numerous other staffing positions were added recently. This argument, relating to the size of Clinton's budget, fails for at least two reasons. Plaintiffs ask the court to make decisions regarding how defendant LeFevre should allocate the Clinton budget. They, in effect, encourage the court to become a super-superintendent of Clinton Correctional Facility. The court is immediately hesitant to accept this invitation—and will not—because to do so would not accord proper deference to the defendants "who are actually charged with and trained in the running of the particular institution under examination." *O'Lone*, 482 U.S. at 349, 107 S.Ct. at 2404; *Fromer*, 874 F.2d at 73; *Hendrix*, 715 F.Supp. at 914. In any event, the plaintiffs failed to demonstrate that the money available to LeFevre is not rationally allocated at the present. They merely rest their argument on the size of his budget and the size of the staff which he supervises.

In addition, there was evidence that a staff change favorable to Clinton PC occurred in 1986. Prior to that date, one sergeant supervised cell blocks C, D, and E. From 1986 to the present one sergeant as his sole responsibility was given E Block, the cell block which houses Clinton PC. The E Block sergeant, next to the sergeant who supervises the special housing unit, has the smallest area to oversee of any sergeant at Clinton. Tr. 369. In this particular, Clinton PC inmates are treated more favorably than most other inmates at Clinton.[9] All told, the court declines to adopt plaintiffs' argument that the size of the budget, the number of staff, and the allocation of both at Clinton demonstrate an irrational animosity towards Clinton PC inmates.[10]

One of LeFevre's concerns relates to the fact that the population at PC is transient.

---

9. In addition, a corrections counselor is assigned to the protective custody unit. Tr. 535–36. The caseload of a corrections counselor working with general population inmates fluctuates between 150–250. Tr. 540–41. The PC corrections counselor has a case load range of 60–100. Tr. 541.

10. Plaintiffs also contend that a pre-fabricated building should be constructed in the E–Block yard to provide programming space. The court will review this suggestion when addressing the fourth *Turner* factor.

*Supra* note 7. By design, the unit PC experiences a great degree of turnover. In conjunction with this transience, LeFevre articulated that "there's a real question of how many inmates in a short term like this ... would show up for programs." Tr. 408. Nonetheless, LeFevre at trial did not contest the assertion that two to three dozen inmates participate in the in-cell study program at Clinton PC. Tr. 426. Plaintiffs charge that, in light of that admission, LeFevre cannot claim that PC inmates are by and large uninterested in programming. The court agrees with plaintiffs in this regard. It is irrational to contend that PC inmates would not be interested in programming.

Even so, another rationale given by LeFevre related to the transience of the population at PC. He stated that "given the short duration of inmates staying in that program, there's a real question of whether that would be a cost-effective program as far as the additional staff, both program and security." Tr. 408. He believed additional programming would not be cost-effective when the entire demands of the facility were taken into consideration. *Id.*

Plaintiffs cannot, on the whole, deny that the PC population is transient. *Supra* note 7. In fact, the percentage of inmates staying for more than 180 days in 1988, 2%, is down from the percentage staying for more than 180 days in 1987, 14%.[11] *Id.* Thus, the PC population in 1988 was more transient than it was in 1987. No one can deny that moving PC inmates out earlier is a positive step; indeed, it is LeFevre's goal to minimize time in PC. Tr. 434. Yet, this is a trend not expressly recognized by plaintiffs in their post-trial submissions. The court finds that plaintiffs have not demonstrated the irrationality of LeFevre's concerns regarding the cost-effectiveness of additional programming for Clinton PC. *Cf. Bell v. Wolfish*, 441 U.S. 520, 543, 99 S.Ct. 1861, 1876, 60 L.Ed.2d 447 (1979) (holding that double bunking of pretrial detainees is not unconstitutional in part because of the length of stay of the detain-

ees, nearly all of whom were released within 60 days).

Plaintiffs also target the ban on general population inmate law clerks in PC. They contend that this is irrational because, previously, inmate law clerks were permitted in PC. LeFevre explained that a directive of the Department of Correctional Services ("DOCS") does not permit general population law clerks to have contact with PC inmates. He testified that he applied for a waiver of this directive and his request was denied. Tr. 383–84. Despite his apparent disagreement with the DOCS directive, LeFevre offered two justifications. Even though a bar gate would separate the inmate law clerk from the PC inmate, LeFevre testified that it would be possible for the law clerk to seriously injure the PC inmate. Further, he explained that the law clerk could extort the PC inmate. Tr. 403.

Plaintiffs counter by arguing that there is no demonstration that when general population law clerks were permitted to have contact with PC inmates that there was any extortion or serious injury resulting from the contact. A former sergeant for E Block, Thomas Marlow, testified at trial that when general population law clerks were permitted to visit PC inmates, the law clerks were pat-frisked and the material the law clerk brought was searched as well for contraband. Tr. 286. Marlow testified that, during his tenure as E Block sergeant, he never received any complaints that law clerks were extorting PC inmates. Tr. 290.

LeFevre testified that he was concerned that if there ever were a vicious attack made possible by contact between a general population law clerk and a PC inmate, "all hell is going to break out as far as lawsuits are concerned criticizing us for not doing our job." Tr. 403. This court is "oblige[d] ... to ensure the ability of prison officials 'to *anticipate* security problems....'" *Fromer*, 874 F.2d at 75 (quoting *Turner*, 482 U.S. at 88, 107 S.Ct. at

---

**11.** In 1987, 38 inmates stayed in PC for over 180 days; seven remained there for over a year. Exh. E. In 1988 two stayed in PC for over 180

days and no one was placed in Clinton PC for over a year. Exh. D. Defendants are to be commended for this improvement.

2261) (emphasis in *Fromer*). Thus, the fact that Marlow neither witnessed nor received complaints regarding extortion by law clerks does not compel this court to conclude that defendants are irrational in prohibiting general population law clerks from interacting with PC inmates. As in *Fromer*, this court will not "second-guess reasonable efforts at ... anticipation" of security problems. *Id.* "The intractable problems of prison administration ... would not be easily solved if prison officials were obliged to wait passively for inmates to disrupt prison security before acting." *Id.* (citation omitted); *see also Morgan v. Ward*, 699 F.Supp. 1025, 1053 (N.D.N.Y.1988) (noting that the Supreme Court extends extreme deference to prison administrators when they are combatting imagined security threats). The fact that general population law clerks were once permitted to interact with PC inmates does not persuade the court that the present prohibition against such interaction is irrational.

As a final point, plaintiffs contend that LeFevre may not rationally assert that involuntary PC ("IPC") inmates would not accept voluntary PC inmates receiving more privileges. Plaintiffs' Post–Trial Memorandum, Doc. 177, at 11; *see* Tr. 411–12. They assert that LeFevre's assertion is irrational because he claimed that all PC inmates accepted receiving less privileges than most other Clinton inmates. Plaintiffs' Post–Trial Memorandum, Doc. 177, at 11; *see* Tr. 433. During his testimony, LeFevre endorsed the theory that a good way to control inmates is to give them privileges which can be taken away as disciplinary measures. Tr. 432–33. A necessary predicate to this conclusion is the premise that inmates, indeed people in general, desire privileges. Of course, the IPC inmates would resent the fact that voluntary PC inmates receive more privileges. Both groups are housed on the same side of cell block E. LeFevre's statement that IPC inmates would not accept voluntary inmates receiving more privileges is not irrational.

His statement regarding PC inmates in general was not, as plaintiffs' contend, that PC inmates "accept" the lessened privileges, rather he stated that they "understand" the lessened privileges. Tr. 433. He asserted that they understand the trade-off between privileges and safety. The fact that PC inmates may "understand" their situation does not necessarily indicate that they "accept" their situation. As evidenced by this lawsuit, at least some PC inmates do not accept their situation and actually resent the lack of privileges. Upon close examination, the court does not find irrational either of LeFevre's statements regarding discrepancies in privileges.

In light of the foregoing discussion, the court finds that plaintiffs have failed to demonstrate that there is not a valid, rational connection between PC conditions and the legitimate governmental interests put forward by the defendants. The court now proceeds to the remaining *Turner* factors.

As a second factor, the Court in *Turner* considered whether there were alternative means of exercising the right that remain open to the prison inmates. This factor is difficult to apply to the instant equal protection claim which revolves around comparing circumstances. It seems more applicable in a situation where an inmate invokes an independent right such as freedom of speech, free exercise of religion, or the right to marriage. *Michenfelder v. Sumner*, 860 F.2d 328, 331 n. 1 (9th Cir. 1988); *see, e.g., Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (freedom of speech and right to marriage); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (free exercise clause); *Fromer v. Scully*, 874 F.2d 69 (2d Cir.1989) (free exercise clause); *Langone v. Coughlin*, 712 F.Supp. 1061 (N.D.N.Y.1989) (right to marriage). Perhaps recognizing that the structure of *Turner* is not easily applied to equal protection claims, one district court has noted the "realistic difficulty of applying the *Turner/O'Lone* factors." *Hendrix*, 715 F.Supp. at 902. This court believes that an assertion of equal protection in general is not subject to an "alternative means"

analysis. Accordingly, the court will continue on to the third *Turner* factor.

The third factor concerns the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on prison resources generally. LeFevre made it very clear that providing to plaintiffs the same privileges as are accorded to other inmates at Clinton would be both costly and disruptive. To enable plaintiffs to use the gym or eat in the mess hall would require additional staff and generally disrupt general population traffic at Clinton. Sergeant Marlow testified that Clinton has no extra program space. Tr. 300. Additionally, recreation on the flats would possibly subject inmates and guards to debris thrown from above. The court concludes that accommodation of the plaintiff's asserted right to equal protection would have an undesirable "ripple effect" on the inmates and staff at Clinton Correctional Facility. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. For this reason, the court "should be particularly deferential to the informed discretion of corrections officials." *Id.*

Finally, the court will consider the fourth factor, the absence of ready alternatives being evidence of reasonableness. The Court has made clear that "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at a *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91, 107 S.Ct. at 2262. Plaintiffs primarily push the idea of constructing a prefabricated building in the E Block Yard. They assert that a prefabricated structure would give them program space for out of cell activities. For instance, it could serve as a classroom or a game room.

Not even plaintiffs' expert, Paul Keve, agreed that construction of a prefabricated building in the E Block yard would generate a mere *de minimis* cost. When asked how much he believed such a structure would cost, he stated:

> Now, what it would cost to [construct and use a prefabricated building] is completely beyond my competence to say at this point. There would be additional cost of training the staff. Before the building is added, the person in charge of the unit ought to be trained in how to develop a more dynamic relationship between staff members and inmates....

Tr. 214. Defendant's expert, Gary Hilton, opined that constructing a building in the E Block yard was an expensive proposition. Tr. 617. He also believed that it would "represent some rather significant security issues." *Id.* Based upon the evidence before it, the court finds that the proposed alternative of constructing and using a prefabricated building in the E Block yard would only be available at more than a *de minimis* cost to valid penological interests.[12]

Other alternatives to improve the conditions of confinement for PC inmates have also been considered by prison officials. As one possibility, Sergeant Marlow testified that he had mentioned upper H–Block as a possible alternative location for PC. Tr. 269. The advantage to placing PC in H Block is that they would be closer to APPU and PC inmates might be able to use some of the APPU programing space. Tr. 298. Furthermore, given Upper H Block's proximity to the gym and the mess hall, PC inmates *might* have access to the gym and the mess hall. Tr. 271, 281–83. However, Marlow indicated that there would be difficulty justifying using Upper H Block for 60 to 80 PC inmates. Tr. 278. It houses 250 inmates and, if general population inmates were housed on Upper H Block, there would be a concern regarding exposing the

---

**12.** Keve did not agree with Hilton's assertion that the prefabricated building would generate security problems. Keve felt that "it could be argued that [a prefabricated structure] might even reduce the security problems" because with the increased programming afforded by that structure prison staff might become better acquainted with the PC inmates, enabling the staff to "take the temperature" of the inmates. Tr. 215. Whichever expert's thesis is followed, the bottom line is that constructing a prefab building plus providing staff for programming would incur costs over and above a *de minimis* level.

PC inmates to general population inmates. Tr. 271, 274, 277. Further, given the length of the galleries on H Block, 44 cells long, it would be more difficult to separate "enemies" than on E Block. Tr. 275, 374. The companies on E Block are 21 cells in length. Stipulation at ¶ 2. The court finds that moving Clinton PC to Upper H Block would give rise to more than a *de minimis* cost to valid penological interests.

Another suggestion proposed in fact by LeFevre was to enclose, or extend, the companies in E Block. Exh. H. This would enable PC inmates to recreate in front of their own companies. *Id.* To implement this proposal would have cost DOCS 2.3 million in 1983 dollars. Tr. 416–17. Even assuming no intervening inflation, this is not a *de minimis* cost. Upon consideration of these two alternatives, the court finds that "there are no 'obvious easy alternatives to the policy adopted by [defendants].'" *O'Lone*, 482 U.S. at 353, 107 S.Ct. at 2407 (quoting *Turner*, 482 U.S. at 93, 107 S.Ct. at 2264).

The Supreme Court has instructed that "[g]overnmental action does not have to be the only alternative or even the best alternative for it to be reasonable, to say nothing of constitutional." *Bell v. Wolfish*, 441 U.S. at 542–43 n. 25, 99 S.Ct. at 1876 n. 25. The court finds that the present conditions imposed upon plaintiffs are reasonable; not desirable, but reasonable. The court holds that plaintiffs have not been denied equal protection under the law.

### III. CONDITIONS AT CLINTON PC; EIGHTH AMENDMENT.

■ Plaintiffs claim that they suffer from behavioral, or what might be termed, psychological or psychiatric, deterioration as a result of their conditions of confinement. They contend that the idleness, the noise and the unconstructive conversation cause a variety of undesirable psychological effects. One former PC inmate testified that the monotony of the PC routine led him to feel hopeless and depressed. Tr. 18. Another former PC inmate contended that he became bored, hostile and frustrated when he was in Clinton PC. Tr. 176.

Another inmate who resided in Clinton PC up until the date of trial testified that because of life in Clinton PC he wanted to "break off," but that he controlled himself. Tr. 348. Yet a fourth inmate testified that conditions at Clinton PC caused him to hallucinate; he thought he was "flying." Tr. 322. However, he never asked for psychiatric assistance with this problem. Tr. 327.

The court credits the testimony of these inmates with regard to their psychological difficulties. The court further finds that Clinton PC is noisy. At trial it was variously described as a "Chinese fire drill" or "like Grand Central Station at break time" or as a "fish market." Tr. 465, 662. Much shouting, hollering and cussing occurs at Clinton PC. Tr. 147. The question is whether the conditions are such that they contravene the eighth amendment's prohibition against cruel and unusual punishment.

*Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) is the first occasion when the Supreme Court "considered a disputed contention that the conditions of confinement at a particular prison constituted cruel and unusual punishment." *Id.* at 345, 101 S.Ct. at 2398. Its opinion in that case sets the groundwork for the eighth amendment discussion in this Memorandum–Decision. Under the *Rhodes* analysis, the eighth amendment "prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain.'" *Id.* at 346, 101 S.Ct. at 2399 (citation omitted). An infliction of pain "totally without penological justification" constitutes unnecessary and wanton infliction of pain. *Id.* Conditions of confinement grossly disproportionate to the severity of the crime committed will also violate the eighth amendment. *Id.* at 347, 101 S.Ct. at 2399. In assessing plaintiff's eighth amendment contentions, this court must base its judgment on objective factors "to the maximum extent possible." *Id.* at 346, 101 S.Ct. at 2399. When previously applying the teachings of *Rhodes*, this court stated:

The inquiry to be made is whether prison conditions are such that they "deprive inmates of the minimal civilized measure of life's necessities." *Id.* [at 347, 101 S.Ct. at 2399.] Not all deprivations, therefore, give rise to eighth amendment concerns.... The eighth amendment is implicated, for example, when inmates are denied "essential food, medical care or sanitation," or when conditions are such that the threat of violence among inmates is increased. [*Id.*] at 348 [101 S.Ct. at 2400].

*Morgan v. Ward,* 699 F.Supp. at 1054.

As noted above, plaintiffs in their eighth amendment argument emphasize the psychological stress which they experience as inmates in Clinton PC. Other federal courts have addressed psychological stress in prison as it relates to the eighth amendment; their analysis is instructive for the situation at bar. Plaintiff's face an uphill battle for, on the whole, "[t]hose courts which have had occasion ... to deal with claims of psychological deterioration caused by confinement have rejected these claims." *Jackson v. Meachum,* 699 F.2d 578, 583 (1st Cir.1983); *compare Sheley v. Dugger,* 833 F.2d 1420 (11th Cir.1987) ("Sheley's twelve-year confinement in [solitary] raises serious constitutional questions"). Furthermore, "lack of stimulating activity ... does not by itself automatically 'establish mental distress which will constitute cruel and unusual punishment.' " *Peterkin v. Jeffes,* 855 F.2d 1021, 1030 (3d Cir.1988) (citation omitted).

█ Plaintiffs have no eighth amendment right to prison work and educational activities. *Rhodes,* 452 U.S. at 348, 101 S.Ct. at 2400; *Peterkin,* 855 F.2d at 1029–30. Simply put, "[i]dleness and the lack of programs are not Eighth Amendment violations." *Hoptowit v. Ray,* 682 F.2d 1237, 1254 (9th Cir.1982). Programming and prison work are "desirable aids to rehabilitation" the delay of which does not implicate the eighth amendment. *Rhodes,* 452 U.S. at 348, 101 S.Ct. at 2400; *Hoptowit,* 682 F.2d at 1255. The court concludes that the complaints of boredom, frustration and hostility arising out of the idleness of PC inmates do not amount to eighth amendment violations.

A further component of plaintiffs' complaint is the extent to which PC inmates are segregated from one another. Before proceeding the court notes that, given the amount of yelling back and forth between PC inmates, the separation experienced by plaintiffs is not absolute segregation, or even segregation in a strict sense. In situations of even more considerable segregation courts have exhibited "a widely shared disinclination to declare even very lengthy periods of segregated confinement beyond the pale of minimally civilized conduct on the part of prison authorities." *Jackson,* 699 F.2d at 583; *see Sostre v. McGinnis,* 442 F.2d 178, 192 (2d Cir.1971) (en banc), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). This court concludes that 22 hours of in-cell time and separation does not amount to an eighth amendment violation. *Cf. DeMallory v. Cullen,* 855 F.2d 442, 445 (7th Cir.1988) (eighth amendment requires five hours of exercise a week); *Anderson v. Coughlin,* 757 F.2d 33, 35–36 (2d Cir.1985) (one exercise hour a day passes eighth amendment muster); *Albro v. County of Onondaga,* 681 F.Supp. 991, 995 (N.D.N.Y.1988) (detainees are to be provided at least one hour of exercise each day).

The First Circuit has cautioned that an eighth amendment violation from psychological deterioration is more likely when the facts presented demonstrate "the threat of substantial, serious and possibly irreversible if not critical psychological illness together with prolonged or indefinite segregated confinement." *Jackson,* 699 F.2d at 584–85. With one exception, the court finds that plaintiffs have not met their burden of demonstrating that the deterioration complained of at trial reached the "substantial, serious and possibly irreversible" level. As alluded to earlier, the complaints of frustration, hopelessness, hostility and even the controllable feeling of wanting to break off do not reach this level. *Accord* Tr. 597.

The one piece of testimony which raises concern of serious psychological illness is the testimony of hallucinations experienced by Lundes Garrett. Tr. 322, 330. However, plaintiffs adduced no evidence, other than Garrett's testimony, that this was caused by the conditions at Clinton PC. Plaintiffs presented no expert testimony from a psychologist or a psychiatrist which explained that Garrett's hallucinations were caused by the conditions at PC. The lack of expert testimony diminishes his claim that the conditions at Clinton PC caused him to hallucinate. *Cf. Sitts v. United States*, 811 F.2d 736, 740 (2d Cir. 1987) (requiring a medical malpractice plaintiff to produce expert testimony of proximate causation in all but the rare case). Furthermore, as Garrett admitted on cross-examination, he did not seek the assistance of anyone on the psychological or psychiatric staff at Clinton. This failure also diminishes the validity of his claim. This court is "not persuaded that the emotional and psychological condition of [Garrett] is attributable to [the conditions at Clinton PC]." *Peterkin*, 855 F.2d at 1030.

Another cause for concern is the noise level at Clinton PC. As set forth above, the atmosphere at Clinton PC has been described as a "Chinese fire drill," "Grand Central Station at break time," and "a fish market." Part of the noise problems apparently stem from the acoustics of E Block, which is an old cell block. Nonetheless, the court observes that the some PC inmates escape the noise by putting on earphones or listening to music. Tr. 323, 349. In addition, because the noise is inmate-generated, it is more difficult to characterize that noise as an impermissible "harsh condition of confinement." *Whitely v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986); *see Wilson v.*

*Seiter*, 893 F.2d 861, 867 (6th Cir.1990). Lastly, plaintiffs presented no evidence that the noise level at Clinton PC causes physical damage. Although it would be desirable for prison officials to investigate and implement means to decrease the level of noise at Clinton PC, the court concludes that the level of noise at Clinton PC does not violate the eighth amendment.

In addition to a condition-by-condition approach to eighth amendment analysis, the *Rhodes* decision appears to endorse a totality of the circumstances approach, for the Court mentioned that prison "[c]onditions ... alone or in combination may deprive inmates of the minimal civilized measure of life's necessities." 452 U.S. at 347, 101 S.Ct. at 2399; *see also Morgan v. Ward*, 699 F.Supp. at 1056. This court has already held that the plaintiffs may not prevail on their eighth amendment claim with respect to psychological deterioration and noise. Further, while the Court in *Rhodes* specifically noted that deprivations of food, medical care, or sanitation are areas of legitimate eighth amendment concern, *id.* at 348, 101 S.Ct. at 2400; *see also Leareau v. Manson*, 651 F.2d 96, 106 (2d Cir.1981), plaintiffs do not challenge those conditions of their confinement. *See* Tr. 555–56 (plaintiffs concede that the prison kitchen is sanitary and that the food is free of harmful bacteria). With respect to these fundamental conditions of confinement, this court credits Gary Hilton's testimony that E Block is sanitary and in good physical condition. Tr. 613–14; 622. This court holds that the conditions at Clinton PC do not deprive plaintiffs of the "minimal civilized measure of life's necessities." On plaintiffs' eighth amendment claim the court finds for defendants.[13]

---

**13.** Because plaintiffs have not prevailed on their eighth amendment claim, as a matter of law they have little chance of prevailing on their substantive due process claim. *Berry v. City of Muskogee*, 900 F.2d 1489, 1494 n. 6 (10th Cir. 1990) ("the legal standards under the Eighth and Fourteenth Amendments are generally congruous"); *Graham v. Connor*, —— U.S. ——, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) ("Any protection that 'substantive due process' affords convicted prisoners against excessive force is

... at best redundant of that provided by the Eighth Amendment."); *Whitely v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986) (in the prison security context, the due process clause affords no greater protection than the cruel and unusual punishments clause). In any event, the court finds that the conditions in Clinton PC do not "shock[ ] the conscience." *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952).

## IV. SURRENDER OF PRIVILEGES TO ENTER PC; EIGHTH AMENDMENT.

■ Plaintiffs contend that they face a "Hobson's choice" between giving up programming or giving up security. They assert that the dilemma for inmates who desire protective custody at Clinton is unconstitutional. The fact that there is a Hobson's choice is undeniable. Tr. 27, 324. The question is whether the dilemma which these inmates face is unconstitutional.

Plaintiffs would have this court find an eighth amendment violation when, in order to obtain protective custody, inmates relinquish benefits enjoyed by general population inmates. However, the inquiry proposed by plaintiffs would lead to inconsistent results. For example, a set of conditions in a protective custody unit which of their own do not contravene the eighth amendment could be held to contravene the eighth amendment if a protective custody inmate gives up programming or other benefits to gain the protection of segregated custody. Another important obstacle to employing the inquiry proposed by plaintiffs is that it runs contrary to Supreme Court authority. In *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), the Court stated that "[t]here is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence." Surely, in the case at bar prison officials may differentiate between inmates in PC and general population inmates in order to avoid institutional disruption or violence. Such discrimination is permissible as long as the conditions at PC do not sink below constitutional minima. *See M.C.I. Concord Advisory Bd. v. Hall*, 447 F.Supp. 398, 401, 404 (D.Mass. 1978).

The *Hall* decision just cited—and relied upon by plaintiffs—sets forth an analysis which avoids the inconsistency of plaintiffs' proposed inquiry. Under the *Hall* analysis, a convicted prisoner cannot be required to waive his right to be free from cruel and unusual punishment in order to gain secure housing at a penal institution. 447 F.Supp. at 401. In evaluating the Hobson's choice argument this court will follow the test set forth in *Hall*. Since the court has already held that plaintiffs have not sustained their burden on the claim that the conditions of Clinton PC violate the eighth amendment, it follows that plaintiffs cannot prevail on an eighth amendment claim premised on the fact that inmates at Clinton PC relinquish certain privileges in return for the safer environment which is available in protective custody. On the Hobson's choice theory of an eighth amendment violation, the court finds for the defendants.

## V. ACCESS TO THE COURTS.

Plaintiffs assert that their conditions of confinement do not afford them meaningful access to the courts. In this regard, the defendants submitted a Policy Sheet for Protective Custody and Administrative Segregation. This document is dated September 7, 1988. Among other items, it sets forth the procedures to be followed in Clinton PC for access to legal materials and legal assistance. This portion of the Policy Sheet states:

4. Law Library.

   a. List of legal books, journals and papers is available upon written request to Law Library.

   b. An inmate may obtain legal materials from the Law Library by submitting a written request. A maximum of two items may be ordered at one time.

   c. The Law Library will deliver the requested items, if available, within 24 hours of receiving the request.

   d. Law Books will be delivered to the block by Law Library runner prior to 11:00 a.m. Company Officers will hand out books following noon meal; inmate must sign blue card for Law Library material. Books will be picked up by Company Officer after next day's morning meal and returned to Law Library runner with blue card. Legal material will be retained for at least 16 hours.

   e. Legal research and typing available from Law Library. Inmate must

request service by green slip, material will be processed by Law Library clerks.

f. No inmate Law Library staff allowed in Protective Custody Unit.

g. All communications between inmates in Protective Custody Status and the Law Library will be monitored by facility staff.

h. All inmate legal materials going to or coming from the Law Library will be subject to search.

i. Whenever a "Law Library Service" item is deemed to be improper or inappropriate, it shall be referred to the area supervisor for a determination as soon as possible. The staff member doing this shall notify the inmate and record the action in the appropriate log.

j. Inmates may be deprived of Law Library services by issuances of Deprivation Order after consultation with Counsel's Office.

Exh. G, at 5–6. The stipulation entered into by the parties reiterates several of the policies listed in Exhibit G. Stipulation at ¶¶ 9–10. One portion of the stipulation clarifies paragraph 4(e) above. According to the stipulation, PC inmates may request photocopying and can make written requests to general population law clerks for assistance.

More than thirteen years ago Judge Foley in *Frazier v. Ward,* 426 F.Supp. 1354 (N.D.N.Y.1977), praised the law library at Clinton. He found that, at that date, it contained 1500 volumes with up-to-date

state and federal reports, digests and statutes. *Id.* at 1371. He further found that there was "eye-opening testimony" in the *Frazier* case which "should reassure many who worry about New York prison conditions, that New York provides the utmost and best in law library facilities and legal assistance for the inmates." *Id.* Clinton Correctional Facility to this day maintains a substantial number and variety of law books at its Clinton Main law library. The volumes available in that library are set forth in the margin.[14]

At trial the court had the benefit of the testimony of Scott Benware, the corrections officer who oversees the law libraries in Clinton Main and in the Clinton Annex. He supervises a staff of 30 inmate law clerks, ten of whom are certified by the West Publishing Company in basic legal research. Tr. 445. Benware testified that the only books not available to PC inmates were the volumes of Shepard's. Tr. 448. As a result, to have a case "Shepardized," a PC inmate must submit a request with the written citation. An inmate law clerk then Shepardizes the case cited. The law clerk copies the citations to the case as they are listed in Shepard's and this information is then forwarded back to the PC inmate who requested the service. Tr. 449.

Benware testified that, if an inmate is facing a deadline, he, Benware, will "on occasions afford [inmates] the opportunity to have more [than two] books in their cells sometimes for a period of time." *Id.* Benware further testified that an inmate can

---

**14.** The Clinton Main law library contains: United States Code Annotated, Full Set; United States Code Congressional and Administrative News Service, 1972 to present; West's Federal Forms; Supreme Court Reporter, Vol. 76 [October Term, 1955] to present; Federal Reporter, Second Series, Vol. 270 [1959] to present; Federal Supplement, Vol. 180 [1959–60] to present; Federal Rules Decisions, Vol. 50 [1970] to present; Shepard's United States Citations; Shepard's Federal Citations; West's Federal Practice Digest, Third Edition; McKinney's Consolidated Laws of New York; McKinney's Session Laws of New York, 1971 to present; West's McKinney's Forms, Selected Volumes; New York Supplement, Second Series, Vol. 1 [1937–38] to present; Shepard's New York Citations; Shepard's New York Supplement Citations;

Shepard's Case Name Citations; New York Codes, Rules and Regulations: Title 7, Corrections and Title 9, Executive—Part F; West's New York Digest, Third Edition; Black's Law Dictionary; Krantz, Cases on the Law of Corrections and Prisoner's Rights; Columbia Law Review, Jailhouse Lawyer's Manual; Corpus Juris Secundum, Selected Volumes; Callaghan's Criminal Law In New York; Callaghan's Criminal Procedure In New York; Wright & Miller's Federal Practice and Procedure, 24 Volumes; Prisoner's Self–Help Litigation Manual; Guide To Criminal Justice Process For Families Of Offenders And Those Who Serve Them—Part One (Spanish Edition); Wren & Wren, Legal Research Manual; Richardson on Evidence; Criminal Law Reporter; New York Law Journal. Exh. M.

request more books than two to insure that he, the inmate, in fact receives two books. If a circumstance arises in which the law library receives requests which are not comprehendible, Benware stated, "as far as the PC, I would have to go down and interview the inmate which to this date I have [not] received any requests for that." Tr. 451. Benware also testified that photocopying is available to PC inmates from an outside contracting service. Tr. 453.

As can be expected, PC inmates expressed discontent with the quality of their access to legal materials. One inmate, Edgar Bagarozy, testified that he received seventy-five percent of the books he requested. Tr. 10. However, he never requested more than two books. Tr. 23. Bagarozy and another inmate, Lundes Garrett, found that it was much more difficult to complete legal research in PC than it was when they had direct access to the law library. Tr. 11, 311. For instance, Bagarozy asserted that in PC it took him a month to accomplish that which he could accomplish in a morning at the law library. Tr. 11. Further, Bagarozy had difficulty obtaining photocopies of court decisions. He asserted that this problem, plus the unavailability of books, caused him to file a supplemental memorandum "without some of the cases [he and a friend in Rahway] would have liked to have had." Tr. 12.

Another inmate, Luis Robinson, complained of delays in obtaining books. Tr. 149. The court also heard testimony from Garrett that, when he sought to have a case Shepardized, he never received a proper list of citations. Tr. 309–10. Garrett also testified that he had difficulty obtaining specific books. Tr. 310–11. However, even though he had to ask for extensions to file some legal papers, he never missed a deadline and he never defaulted on a case. Tr. 332.

The court credits the inmates' testimony that it takes them a significantly longer period of time to research a question in PC than when they have access to the main law library. The court further credits their testimony that requests for Shepardization are often completed improperly, for what-ever reason, whether out of spite or lack-a-daisicalness. Although Benware testified that he was available to confer with PC inmates, he admitted that he had not received any requests. The court does not believe that he is consistently available to PC inmates. He has thirty inmate personnel to supervise and his availability is not publicized in the Policy Sheet, Exhibit G. Neither does the court accord much weight to Benware's statement that he permits an inmate to request more than two books in order to insure that he will at least receive two books. While this may be an intelligent approach to minimizing the restraints placed upon legal research in Clinton PC, this procedure is not explained in the PC Policy Sheet.

In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1979), the Supreme Court resoundingly affirmed the doctrine of meaningful access to the courts. The constitutional underpinning of this doctrine has been variously stated. Thus, four justices of the Supreme Court recently indicated that the meaningful access doctrine arises out of the constitutionally guaranteed rights to equal protection under the law and to due process of law. *Murray v. Giarratano*, —— U.S. ——, 109 S.Ct. 2765, 2771 n. 6, 106 L.Ed.2d 1 (1989) (plurality opinion). Soon thereafter the Eleventh Circuit indicated that the right to meaningful access takes its cue from the first amendment's protection of free speech. *Thomas v. Evans*, 880 F.2d 1235, 1241 (11th Cir. 1989) (citing *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)).

Whatever its origin, "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498. The right embodied by the *Bounds* decision places an affirmative duty on prison officials to provide constitutionally adequate access. *Id.* at 829, 97 S.Ct. at 1498. As a result, in some instances, pris-

on inmates need not allege an injury in order to raise a meaningful access claim.

In determining whether there must be proof of an actual injury, the court must perform the following analysis: first, this court must

> determine whether the right of access claimant alleges inadequate "law libraries or alternative sources of legal knowledge," ... that is, whether the claimant alleges a denial of "adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. [at] 828 [97 S.Ct. at 1498]. Second, if the claims do not involve such an allegation, the court must consider whether the plaintiff has alleged an "actual injury" to court access. An "actual injury" consists of some specific "instance in which an inmate was actually denied access to the courts." ... Only if actual injury is alleged does a plaintiff state a claim for which relief can be granted. On the other hand, if one of the core requirements under *Bounds* is involved—the adequacy of either law libraries or legal assistance—then there is no "actual injury" requirement.

*Sands v. Lewis*, 886 F.2d 1166, 1171 (9th Cir.1989); *accord Peterkin v. Jeffes*, 855 F.2d 1021, 1041–42 (3d Cir.1988); *see also DeMallory v. Cullen*, 855 F.2d 442, 448 (7th Cir.1988); *cf. Smith v. Coughlin*, 748 F.2d 783 (2d Cir.1984) (awarding nominal damages for violation of a prisoner's sixth amendment rights).

▮ In contradistinction to the rights of prisoners previously discussed where the burden is on the plaintiffs to prove a violation, when a meaningful access issue is properly before the court, the prison authorities "bear the burden of demonstrating the adequacy of the means they chose."[15] *Campbell v. Miller*, 787 F.2d 217, 226 (7th Cir.), *cert. denied*, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986); *accord DeMallory*, 855 F.2d at 448; *Buise v. Hudkins*, 584 F.2d 223, 228 (7th Cir. 1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979); *Sostre v. McGinnis*, 442 F.2d 178, 201 (2d Cir.1971) (en banc), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 & 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). Prison officials may meet their meaningful access responsibilities by either of two means. They "must provide inmates with access to an adequate law library or, *in the alternative*, with adequate assistance from persons trained in the law." *Lindquist v. Idaho State Bd. of Corrections*, 776 F.2d 851 (9th Cir.1985) (emphasis in original).

▮ In the case at bar, plaintiffs directly challenge the adequacy of the law libraries and the legal assistance available to them. As a result, they need not prove any actual injury; they need not prove that they, or anyone, was denied access to the courts. Consequently, the burden shifts to defendants to prove that they either provide plaintiffs with an adequate law library or with adequate assistance from persons trained in the law. Defendants contend that they provide plaintiffs with both alternatives. *See* Defendant's Post–Trial Memorandum, Doc. 179, at 24. As this court divines the defendants' argument, they, in essence, contend that through the combination of trained assistance, plus the books available to PC inmates on an overnight loan basis, they comply with the meaningful access standard.

The court concludes for the following reasons that the defendants do not provide the plaintiffs with adequate legal assistance. Because PC inmates may only com-

---

**15.** In this court's opinion the *Turner* factors are not readily adaptable to meaningful access claims. The *Turner* factors serve as a lens for translating into the prison context those constitutional rights for which the original interpretation arose outside a prison setting. Examples of these "outside" rights have been cited above; they include equal protection, free speech, free exercise of religion and the right to marriage. In contrast to these rights, the right to meaningful access to the courts arose within the prison context. *See, e.g., Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). In a similar fashion, the interpretation of the eighth amendment arose from conditions found in prisons, such as sanitation, ventilation, exercise or medical care. In keeping with this court's analysis, subsequent to the *Turner* and *O'Lone* decisions at least two courts of appeals have not applied the *Turner* factors when evaluating eighth amendment claims. *Peterkin*, 855 F.2d at 1023–33; *DeMallory*, 855 F.2d at 444–46.

municate with general population law clerks in writing, a PC inmate's ability to swap ideas and gain guidance is impaired. *See Valentine v. Beyer,* 850 F.2d 951 (3d Cir.1988) (rejecting plan to reduce paralegal assistance for close custody prisoners whose access to law books was limited to a library paging system); *Watson v. Norris,* 729 F.Supp. 581, 584 (M.D.Tenn.1989) ("legal secretaries" are of "little practical use" when the legal secretaries may not meet with an inmate who requests assistance). Furthermore, the defendants do not guarantee that a PC inmate who requests assistance with legal research will receive the assistance of a trained inmate law clerk. Given the ratio of trained to untrained law clerks—1 to 2—the odds are good that a PC inmate would receive assistance from an untrained law clerk. Yet, it is well-established that "[a]n untrained legal research staff is insufficient to safeguard an inmate's right to access to the courts." *Valentine,* 850 F.2d at 956 (citing *United States ex rel. Para–Professional Law Clinic v. Kane,* 656 F.Supp. 1099 (E.D.Pa.), *aff'd without decision,* 835 F.2d 285 (3d Cir.1987), *cert. denied,* 485 U.S. 99, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988)); *accord DeMallory,* 855 F.2d at 447 & n. 3. Finally on the issue of legal assistance, the court is not convinced that Benware, who oversees the law library, is sufficiently available to meet the legal research needs of PC inmates.

With respect to the adequacy of the book request system, "[b]ecause of the practical difficulties involved in doing research without free access to a library, ... courts tend to give close scrutiny to ... 'remote control' arrangements." *Watson,* 729 F.Supp. at 585 (citing *Williams v. Lane,* 851 F.2d at 879; *Morrow v. Harwell,* 768 F.2d 619, 623 (5th Cir.1985); *Jones v. Diamond,* 594 F.2d 997, 1024 (5th Cir.1979), *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981)); *accord Tillery v. Owens,* 719 F.Supp. 1256, 1282 (W.D.Pa.1989). In this regard, the following passage penned by Chief Judge Haynsworth of the Fourth Circuit has frequently been quoted.

> Simply providing a prisoner with books in his cell, if he requests them, gives the prisoner no meaningful chance to explore the legal remedies he might have. Legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery of an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or more assistance than the trained lawyer in exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

*Williams v. Leeke,* 584 F.2d 1336, 1339 (4th Cir.1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979).

In some instances, paging or book request systems have been upheld as constitutional. In this respect, the Seventh Circuit has held that, absent adequate legal assistance, an exact cite system "may be permissible" if it is "supplemented by adequate reference materials in [a] basic library." *DeMallory,* 855 F.2d at 447. Numerous federal courts have approved exact cite systems supplemented by a basic library. *See, e.g., Wood v. Housewright,* 900 F.2d 1332 (9th Cir.1990) (satellite law library and inmate law clerks supplement book request system); *Caldwell v. Miller,* 790 F.2d 589, 605–07 (7th Cir.1986) (exact cite system in conjunction with a basic law library); *Campbell v. Miller,* 787 F.2d 217 (7th Cir.) (same), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986); *Peterkin v. Jeffes,* No. 83–0304, 1989 WL 140489, 1989 U.S.Dist. LEXIS 13828 (E.D.Pa. November 14, 1989) (approving settlement providing death row inmates with a mini-law library and ability to order full copies of decisions from main library), *on remand from,* 855 F.2d 1021 (3d Cir. 1988).

This court concludes that the present book request system at Clinton PC does not provide plaintiffs with meaningful, adequate access to the courts. *See generally United States ex rel. Para–Professional*

*Law Clinic v. Kane,* 656 F.Supp. 1099 (E.D.Pa.), *aff'd without decision,* 835 F.2d 285 (3d Cir.1987), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988). PC inmates are not able to browse through materials in order to compare legal theories and formulate ideas. This is a constitutionally impermissible situation and it is exacerbated by several factors. PC inmates experience delays in receiving books. They also upon occasion receive books other than the ones they requested. Finally, their requests that citations be Shepardized are often completed improperly.

In making the determination of inadequacy, the court is fully aware that Judge Foley approved the present book request system with respect to the inmates interned in the Special Housing Unit ("SHU") in Clinton. *Frazier v. Ward,* 426 F.Supp. at 1371–72. Inmates are placed in SHU for disciplinary purposes because they violate institutional rules. *Id.* at 1356. Plaintiffs seek to distinguish the situation in *Frazier* from the case presently before the court. First, plaintiffs contend that Judge Foley in *Frazier* was responding to the special situation of inmates in SHU. Second, they point out that *Frazier* predates *Bounds.*

This court offers the following observations regarding *Frazier.* First, Judge Foley in that decision did not consider any options other than direct access to the main law library. He made the point that direct access to the law library "would in effect diminish the purposes of the segregated confinement." 426 F.Supp. at 1371. This rationale in Judge Foley's decision is not contravened by this court's decision today. In the context of Clinton PC, there remains the possibility that other means of providing legal assistance or access to legal materials would not diminish the purposes of the segregation provided to plaintiffs. A corollary to the segregation experienced in SHU is the disciplinary nature of SHU confinement. The inmates in SHU are likely to be the Clinton inmates who are most difficult to control, *see Aliym v. Miles,* 679 F.Supp. 1, 2 (W.D.N.Y.1988) ("SHU inmates are considered to be a threat to other inmates, staff, and the security of the facility"); restricting their access to legal materials and assistance may be justified because of the demeanor of SHU inmates. *See DeMallory,* 855 F.2d at 447 n. 1; *Campbell,* 787 F.2d at 228.

As an additional point, Judge Foley relied on the availability to Clinton inmates of Prisoners' Legal Services ("PLS"). He stated: "Most importantly, the fact that in New York State there is now a new Prisoners' Legal Services, with a substantial number of lawyers located in Plattsburgh to service Clinton ... does provide every human assurance possible that Unit 14 inmates, with possibly worthy constitutional claims, will have those claims considered for court presentation." 426 F.Supp. at 1371. However, the defendants currently do not rely on the presence of Prisoners' Legal Services in arguing that plaintiffs have meaningful access to the courts. Although the court has searched the record, it has found no disclaimer placed on the record by the defendants' counsel. Nonetheless, this court's recollection is that the defendants agreed at trial that they would not pursue the theory that plaintiffs are provided with meaningful access to the courts through PLS.

In any event, if defendants were to contend that PLS provided plaintiffs meaningful access, such a contention would most likely be unpersuasive. There is no indication that PLS can or will represent every inmate who requests assistance from PLS. To rely on PLS the defendants would have to demonstrate that its assistance was "available for all relevant proceedings." *Peterkin,* 855 F.2d at 1042. Because of the nature of the defense to the meaningful access claim, there was no evidence adduced at trial regarding the extent of the availability of PLS.

The court has reviewed the inventory of law books which are available to the occupants of Clinton PC. This inventory is constitutionally sufficient. While the difficulties surrounding the procurement of accurate citations out of Shepards are problematic, *Lindquist,* 776 F.2d at 856, those difficulties do not render the law book inventory constitutionally inadequate. *Id.* Since the inmates have access to digests,

both state and federal, they have a means of updating older cases. In the words of Judge Foley, Clinton contains a "well-stocked library." 426 F.Supp. at 1354. Plaintiffs have access to a law book inventory which rises above the constitutional minimum.

On the claim that plaintiffs are deprived of meaningful access to the courts, the court for the reasons articulated above finds for plaintiffs.

## VI. FREE EXERCISE OF RELIGION.

■ The final claim which this court must adjudicate is plaintiffs' claim that they are denied their first amendment right to freely exercise their religious beliefs.[16] Plaintiffs recognize that the Second Circuit has upheld the denial of congregate religious services to an inmate confined in administrative segregation.[17] *Matiyn v. Henderson*, 841 F.2d 31 (2d Cir.), *cert. denied*, 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Mumin v. Phelps*, 857 F.2d 1055 (5th Cir.1988); *Shabazz v. Coughlin*, 852 F.2d 697 (2d Cir. 1988); *Tremunde v. Cook*, 684 F.Supp. 255 (D.Utah 1988); *Aliym v. Miles*, 679 F.Supp. 1 (W.D.N.Y.1988) (denial of congregate services to an inmate housed in SHU). Plaintiffs currently ask that the court "direct defendants to provide plaintiffs with truly private meetings with religious counselors." Plaintiffs' Post–Trial Memorandum, Doc. 177, at 27. Ironically, defendants assert that they already provide this opportu-

nity. Defendants' Post–Trial Memorandum, Doc. 179, at 25–26.

Given the cases cited above, the court's analysis in footnote 17, and plaintiffs' apparent concession, the only issues for the court to decide on this claim are whether the inmates in Clinton PC are permitted "truly private meetings" with religious counselors, and, if not, whether the constitution requires such meetings. The court will commence with a review of the trial record.

The Protective Custody and Administrative Segregation Inmate Handbook, Exhibit G, contains a brief description of the religious opportunities open to PC inmates. It states:

> 4. Religious Programs:
>   a. Chaplains shall visit Unit at least once per week for religious guidance/counseling. Chaplains will also respond to request for interview slips.
>   b. Attendance at congregational/religious services will not be allowed.

At trial, Deacon Donald Dashnaw, a Roman Catholic chaplain at Clinton, testified that if PC inmates want to give confessions, they could do so with a priest in a room on the top floor of E Block. Tr. 586. Dashnaw himself, since he is not a priest, has never participated in such a procedure. *Id.*

The inmate witnesses developed a different picture at trial. Garrett testified that he only saw the Catholic chaplain on E Block. Garrett did meet with the chaplain on occasion. The conference would occur through the cell bars. Tr. 313. Garrett

---

**16.** Plaintiffs no longer pursue their claim that defendants are violating plaintiffs' eighth amendment right to receive adequate protection from harm.

**17.** Absent this apparent concession, the court would reach the same conclusion. The security, protection and fiscal concerns expressed by the defendants are legitimate. Prohibiting congregate religious services is rationally related to those objectives. As defendants' expert, Gary Hilton, stated:

> Reasonable people ... frequently ask[,] well, if you can let them play basketball together, why can't they live together? Well, there is a difference. The correctional authorities can structure and designate the basketball constel-

lations or groupings. Correctional officials cannot structure worship groups. Inmates pretty much can pursue the service they want.... [This] takes away from management the ability to ensure [inmates'] safety absent having to confront the freedom of religion issues.

Tr. 620. No alternative to congregate religious services is available, although plaintiffs may on an individual basis meet with a religious advisor. Any accommodation of the asserted right to congregate services would have an impact on the guards and other inmates. Plaintiffs have not demonstrated that religious congregations are possible through any ready alternatives.

was unsatisfied with this procedure because it provided him with no privacy. Tr. 314. Garrett testified that because of the idleness in PC, other inmates would "zero in on" his conversation with the chaplain. Bagarozy and Black reported that they were never informed that they could meet in a private setting with a chaplain. Tr. 14, 346. Indeed, Garrett recounted that, for some unspecified reason, his request for a private meeting with the chaplain was refused. Tr. 335–36.

From the evidence placed before this court at trial, the court finds that there is at least one room available in E Block where PC inmates may confidentially confer with Clinton staff or a religious advisor. As just noted, Dashnaw testified to its availability. In addition, a former corrections counselor for Clinton PC, Marita Rumph, testified that "there was a room upstairs" which was available if an inmate wished to speak confidentially with a corrections counselor. Tr. 542.

The court further finds that PC inmates are rarely provided opportunities to engage in confidential discussions in rooms apart from their cells with a priest, chaplain or other religious advisor. *See* Stipulation at ¶ 11 (meetings with religious advisors usually occur at the PC inmate's cell). Deacon Dashnaw's testimony that PC inmates are provided with this opportunity is unconvincing. By his own admission, he has never met privately with an inmate in a room on the top floor of E Block. In addition, the PC Policy Sheet does not explain to PC inmates that they may request private meetings or confidential confessions. It seems natural, then, that inmates Bagarozy and Black were unaware of any policy permitting PC inmates to receive religious counseling in a setting other than

through cell bars. Moreover, Garrett's statement that his request for a private meeting was denied was neither explained nor controverted by the defendants.

Any meeting between a religious advisor and an inmate through cell bars is fraught with at least two problems. On the one hand, as Garrett testified, it is not genuinely private. Other inmates may overhear portions of the conversation. Even if the conversation through the cell bars is carried on in hushed tones, an inmate on the one hand may reasonably feel uncomfortable about revealing confidentialities for fear that the conversation may be overheard.[18] On the other hand, there is a multitude of testimony that Clinton PC is a loud, noisy environment. If an inmate and a religious advisor attempt to carry on a conversation in lowered voices, part of the conversation may be drowned out at any given moment.

One might argue that since the facility is noisy the other inmates will be unable to overhear a conversation between an inmate and his spiritual advisor. The court does not find this convincing. The point remains that confidentialities are likely to be lost in the noise. Further, to overcome the noise, it is likely that an inmate and a religious advisor will raise their voices and thus chances are increased that the two will be overheard.

For segregated inmates, "individual religious counseling and ministration" provides a reasonable alternative to "attendance at regular general religious services" when prison officials prohibit congregate religious activities because of legitimate concerns for the maintenance of order and security in their facility. *Sweet v. South Carolina Dept. of Corrections,* 529 F.2d 854, 864 (4th Cir.1975); *Diamond v.*

18. Another district court has found that cellside confessions lack privacy. *Williams v. Lane,* 646 F.Supp. 1379, 1387 (N.D.Ill.1986), *aff'd,* 851 F.2d 867 (7th Cir.1988), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989). The district court in *Williams* described this scenario as "embarrassing or humiliating." *Id.*

In *Peterkin,* by contrast, the Third Circuit upheld the district court's finding that through lowered voices privacy could be achieved in cell door meetings between psychiatric counselors and inmates. 855 F.2d at 1029 n. 13. In that instance, an inmate and several doctors testified that cell visits afforded sufficient privacy if one spoke quietly. *Peterkin v. Jeffes,* 661 F.Supp. 895 (E.D.Pa.1987). In the testimony of the case at bar, Deacon Dashnaw testified that PC inmates are satisfied to receive communion between the cell bars. Tr. 587. He did not indicate that they are content to give confession to an individual standing on the other side of the cell bars. *See* Tr. 592.

*Thompson,* 364 F.Supp. 659, 667 n. 7 (M.D. Ala.1973). As plaintiffs apparently concede and as this court has concluded, defendants have legitimate security and administration concerns which justify the ban on congregate religious services for PC inmates. *See supra* note 17. The remaining question is whether the cellside alternative usually provided to plaintiffs passes constitutional muster.

In *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Supreme Court upheld a prison policy which did not permit Muslim inmates on work details to return to the prison for Friday afternoon services. In reaching this decision, the Court "examined whether the inmates were deprived of 'all means of [religious] expression.'" 482 U.S. at 352, 107 S.Ct. at 2406 (citing *Turner v. Safley,* 482 U.S. at 92, 107 S.Ct. at 2263). The Court concluded they were not. Prayer and discussion were virtually unlimited during nonworking hours. The prison provided special dietary and meal arrangements for Muslim prisoners. In addition, a state-provided imam (religious leader) was granted "free access to the prison." *Id.* Accordingly, the Court recognized—in the context of the free exercise clause—the meaningfulness of providing an inmate the opportunity to confer with a religious or spiritual leader. *Accord Cooper v. Tard,* 855 F.2d 125, 129 (3d Cir.1988); *Sweet,* 529 F.2d at 864; *cf. Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam) (inmate stated a claim by alleging that he was placed in solitary confinement for sharing Buddhist materials with other inmates).

The decision in *Card v. Dugger,* 709 F.Supp. 1098 (M.D.Fla.1988), *aff'd mem.,* 871 F.2d 1023 (11th Cir.1989), is instructive on the issue of whether an inmate should have the right to *privately* confer with a religious advisor. The court in *Card* addressed the circumstances of a Catholic death row inmate who claimed he was denied the free exercise of his religion by prison policies. For most of the duration of his placement on Death Watch, a status given a prisoner during the pendency of his death warrant, prison officials refused to grant the plaintiff contact visits with his priest. The authorities permitted the plaintiff to speak with a priest privately in a no-contact booth. The booth was made of glass and it contained a voice baffle screen through which a visitor and an inmate could speak. The plaintiff complained that the set-up was inadequate for private conversations because he was under the observation of a corrections officer. Nonetheless, the inmate was able put his mouth directly on the voice baffle and the priest was able to place his ear on the other side. The court in *Card* held that this arrangement, uncomfortable though it may be, "provide[d] for both Plaintiff's privacy needs and for the Department of Corrections' security needs." 709 F.Supp. at 1105. Important for the purposes of the free exercise claim is the recognition in *Card* that the plaintiff possessed constitutionally cognizable "privacy needs" when he engaged in confidential discussions with a priest.

A broadly adopted evidentiary privilege, the priest-penitent privilege, *see* J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 506[04], at 506–14 to 506–19 (1989), underscores the value of privacy in situations where an individual speaks confidentially with a clergyman or other spiritual advisor. The Supreme Court has remarked favorably on this privilege. When contrasting the privilege against adverse testimony by a spouse with other evidentiary privileges, the Court observed that "[t]he priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980); *see also United States v. Wells,* 446 F.2d 2, 3 (2d Cir.1971) ("While the [priest-penitent] privilege has been recognized in the federal courts it appears to be restricted to confidential confession or other confidential communications of a penitent seeking spiritual rehabilitation."). New York State law acknowledges the priest-penitent privilege as codified in sec-

**1028**

tion 4505 of the NY CPLR. Section 4505 forbids the disclosure of "a confession or confidence made to [a clergyman, minister or accredited Christian Science practitioner] in his professional character as spiritual advisor." The strength of the impetus behind the priest-penitent privilege is evident because it has survived the judicial view that "[t]he suppression of truth is a grievous necessity at best." *McMann v. SEC,* 87 F.2d 377, 378 (2d Cir.) (L. Hand, J.), *cert. denied,* 301 U.S. 684, 57 S.Ct. 785, 81 L.Ed. 1342 (1937); *accord Trammel,* 445 U.S. at 50, 100 S.Ct. at 912. In this court's opinion, the existence of the priest-penitent privilege further supports plaintiffs' claims for meaningful private meetings with religious advisors. Based upon the foregoing discussion, it is this court's conclusion that the free exercise clause recognizes the need for privacy in confidential communications between inmate and spiritual advisor. In order to reach a decision with respect to plaintiffs' claimed entitlement to "truly private meetings," the court turns once again to the factors set forth in *Turner v. Safley.*

The application of the *Turner* factors with respect to the asserted claim to private meetings will neither be lengthy nor difficult. Defendants have not contested the plaintiffs' right to such meetings. Thus, they have not put forward any penological interests which they claim require the court to rule in their favor with respect to private religious consultations or confessions. Although security of inmates and staff might be a concern, based on the evidence placed before this court at trial, the court cannot find that security concerns would act to prevent such private meetings as to the entire PC population. Of course, inmate by inmate evaluations might prove necessary.

The court also finds that there are no alternative means available to plaintiffs by which they may exercise their right to private meetings with spiritual advisors. While it is conceivable that PC inmates may find a kindred spirit in the exercise yard, that is but a mere possibility. The court does not consider individual prayer to be the equivalent of meetings with a religious advisor. The court finds that the

exercise of the asserted right will have a limited effect on the corrections officers who are stationed at E Block. As Marita Rumph, the corrections counselor indicated, E Block contains at least one room where private counseling has occurred in the past. Thus, there is an indication that accommodating PC inmates' request for a confidential meeting with a religious advisor will not unduly burden the security staff; they have accommodated similar requests in the past. While granting PC inmates the asserted right may place additional burdens on the chaplaincy staff at Clinton, no evidence was adduced to that effect. In fact, a fair interpretation of Deacon Dashnaw's testimony is that any burden in this area would be accepted by the chaplaincy staff. The final *Turner* factor is whether ready alternatives exist. This court considers the use of an upstairs room to constitute a ready alternative.

In reaching a decision on the free exercise claim, the court has been ever mindful of the Supreme Court's own hesitancy to permit the free exercise clause to explode into a multitude of inmate requests for identical religious treatment. The Court has stated:

> We do not suggest ... that every religious sect or group within a prison— however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty.

*Cruz v. Beto,* 405 U.S. at 322 n. 2, 92 S.Ct. at 1081 n. 2; *accord Benjamin v. Coughlin,* 905 F.2d at 577–78 (free-world sponsorship requirement upheld). However, the court presently is not asked to distinguish between PC inmates based upon their religious denominations. Instead, the court is presented with a generic desire for private, meaningful conversations with a priest,

minister, clergyman or other religious advisor.

Based upon the record before it, this court concludes that defendants have not afforded plaintiffs a reasonable opportunity to exercise their religious freedom as guaranteed by the first and fourteenth amendments. The court therefore finds for plaintiffs on their free exercise claim to the extent that plaintiffs as individuals in a group are denied "truly private meetings" with religious advisors.

## VII.  DIRECTIONS AND CONCLUSION.

The defendants are directed to submit for the court's approval plans rectifying the denial of plaintiffs' constitutional rights to freely exercise their religious beliefs and to be afforded meaningful access to the courts. The proposed plans shall be served and filed on or before October 1, 1990. Plaintiffs' objections, if any, shall be served and filed on or before October 23, 1990. Counsel for both sides are directed to appear before the court on November 2, 1990 at 2 p.m. in Syracuse, New York. At that time the court will hear from all counsel with respect to the propriety of the defendants' proposed plans. The court strongly recommends that the defendants confer with plaintiffs' counsel prior to the submission of their strategy for providing to plaintiffs meaningful access to the courts and private, meaningful religious meetings.

The court directs the clerk of the court to enter judgment as follows: judgment shall be entered for plaintiffs on the claims that defendants violated their rights to freely exercise their religious beliefs and that defendants have denied them meaningful access to the courts; judgment shall be entered for defendants on plaintiffs' equal protection, eighth amendment, and substantive due process claims.

It is So Ordered.